**Edward L. GREENBLATT, Plaintiff-Appellant,**

v.

**DREXEL BURNHAM LAMBERT, INCORPORATED, Defendant-Appellee.**

**No. 84–8522.**

United States Court of Appeals, Eleventh Circuit.

June 25, 1985.

Theodore G. Frankel, Marilyn S. Bright, Atlanta, Ga., for plaintiff-appellant.

Paul W. Stivers, Janice E. Garlitz, Atlanta, Ga., for defendant-appellee.

Before RONEY and HILL, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

This case arises from a dispute over the balance owed by plaintiff/appellant on a securities margin account opened with defendant/appellee. The district court granted summary judgment in favor of the defendant, finding that plaintiff was collaterally estopped from prosecuting a RICO claim due to findings made in an earlier arbitration, and .that a two-year statute of limitations precluded plaintiff's federal securities claims. We affirm the grant of summary judgment on these claims, but remand for further consideration of a pendent issue.

## I. FACTS

In April, 1975, appellant Greenblatt, a practicing attorney in Atlanta, transferred his securities margin account to appellee Drexel Burnham Lambert, Inc. (Drexel Burnham). A customer's agreement (margin agreement) was executed, which contained an arbitration clause providing that any controversy arising out of or relating to the contract or the breach thereof would be settled by binding arbitration. It was and is Drexel Burnham's practice to send every new margin account a letter describing the method of computing interest on a

margin account,[1] although there is no evidence in the record as to whether Greenblatt actually received such a letter.

There was limited trading in Greenblatt's account through August, 1976. The account contained a 1976 year-end debit balance of $11,694.83. From then until May, 1983, when the account was liquidated, there was no activity in the account except for the receipt of dividends and the charging of interest on the debit balance. Each month during the time the account was open, Greenblatt received a statement from Drexel Burnham which showed all transactions in the account during the month, all positions, the opening and closing balances, the average daily balance, the monthly interest rate, and the amount of interest charged for the month. All information necessary to calculate the margin interest appeared in the monthly statements. There is no indication that Greenblatt ever notified Drexel Burnham of any discrepancies in calculation of interest on the account until the present dispute arose in 1982.

In June, 1982, due to a decline in the stock market, Drexel Burnham sent a margin call to Greenblatt, who replied that he owed no money on the account.

On August 10, 1982, Drexel Burnham made demand upon Greenblatt to arbitrate the dispute concerning the balance owed on the margin account, and subsequently initiated arbitration proceedings with the New York Stock Exchange. The arbitration hearing was initially scheduled for January 19, 1983, but was postponed and rescheduled for May 17, 1983, due to a conflict with Greenblatt's schedule.

On March 29, 1983, Greenblatt filed a complaint against Drexel Burnham in Georgia state court, asserting various state common law claims (including breach of fiduciary duty, fraud, and misapplication of funds). On April 26, 1983, Drexel Burnham removed the case to federal district court and moved to stay the proceedings pending the scheduled arbitration hearing.

On May 16, 1983, the day before the scheduled arbitration hearing, Greenblatt filed an amended complaint in federal court setting forth eight claims against Drexel Burnham: a violation of Rule 10b–16, 17 C.F.R. § 240.10b–16, promulgated under the Securities Exchange Act of 1934; a violation of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961, 1964; a violation of Rule 10b–5, 17 C.F.R. § 240.10b–5; and various state common law claims. In essence, Greenblatt's complaint alleged that Drexel Burnham misrepresented the amount of interest to be charged on the account; failed to make proper disclosure concerning the methods for computing interest; and charged an unreasonable and usurious amount of interest on the account.

Along with the amended complaint, Greenblatt moved for a temporary restraining order to stay the arbitration scheduled for the next day on the grounds that his federal securities claims were not arbitrable and were intertwined with his other claims. The district court held a hearing on the morning of May 17, and the T.R.O. was denied.

On May 17, the arbitration hearing took place. Both parties were represented by counsel, presented and cross-examined witnesses, and introduced documentary evidence. Extensive evidence was presented as to the disclosures made by Drexel Burn-

---

1. This two-page document provided, in part, that:

> To assist you, there will appear on your [monthly] statement, for each type of account charged interest, the average debit balance, the interest rate charged and the number of days for which interest was charged. When the call rate changes during the month there will be a separate entry for each rate. *This statement should be retained as it contains information that may be needed to enable you* to verify interest charges appearing on subsequent statements. With these details it will be possible for you to estimate your monthly interest charge. Interest is arrived at by the normal formula—Principal × Rate × Time on a 360 day year basis. This is the same basis that banks charge us for funds borrowed by us to finance your accounts. If there are any questions regarding this, please contact your Account Executive.

ham to Greenblatt, the computation of interest charges on the margin account, the contents of the monthly statements sent to Greenblatt, and the possibility that the interest charges were usurious. Greenblatt admitted receiving monthly statements from Drexel Burnham detailing the interest charged on the debit balance in his account. He also admitted that he took no action to close the account or to notify Drexel Burnham as to problems in the computation of interest. The arbitration panel ruled in favor of Drexel Burnham, finding that it was legally entitled to the debit balance and all of the interest charged on the balance, in the amount of $26,974.67.[2] No specific factual findings were set forth in the panel's decision.

On July 7, 1983, the district court dismissed the state common law claims on the grounds that those claims were arbitrable and had in fact been arbitrated and determined on May 17th. The district court granted Greenblatt twenty days in which to amend the remaining counts (10b–5, 10b–16, and RICO) of his complaint in order to comply with the specificity requirement of Rule 9(b), Fed.R.Civ.P. These counts were amended on July 27.[3]

On May 30, 1984, the district court granted summary judgment to Drexel Burnham on the three remaining counts in Greenblatt's complaint. The 10b–5 and 10b–16 claims were held to be barred by the statute of limitations. Greenblatt was held to be collaterally estopped from litigating his RICO claim by the arbitrators' adverse determination of the facts underlying the claim. A final order was entered, granting summary judgment for Drexel Burnham on all counts.

## II. DISCUSSION

Appellant Greenblatt raises three issues on appeal: (1) whether his Rule 10b–16 claim is barred by the statute of limitations; (2) whether the RICO claim was properly dismissed on collateral estoppel grounds; and (3) whether the district court decided all the claims presented to it.

### A. *Rule 10b–16 Claim*

The district court assumed *arguendo* that a private cause of action could be implied under Rule 10b–16, but held that the claim was barred in the present case by the two-year statute of limitations[4] borrowed from the Georgia Securities Act pursuant to the holding in *Diamond v. La-Motte*, 709 F.2d 1419 (11th Cir.1983).[5] Appellant contends that a longer statute of

---

**2.** The arbitration panel expressly declined to decide the federal securities law claims.

**3.** As finally amended, Greenblatt alleged:

1. A violation of Rule 10b–16, resulting from Drexel Burnham's failure to disclose conditions for imposing interest, the manner of computing interest, the rates of interest charged, and proposed changes in interest rates, as required or when required by Rule 10b–16;

2. A violation of Rule 10b–5, for fraudulent misrepresentations and omissions relating to the calculation of interest on the account, and for other alleged fraudulent acts; and

3. A RICO violation, amounting to an amalgamation of many of the previously alleged state law and federal securities claims, alleging a scheme to defraud and obtain money by false pretenses through the mailing of false and fraudulent monthly statements, which statements imposed extortionate and excessive interest charges without disclosure or explanation contrary to the agreement of the parties and federal and state law.

**4.** The district court stated that:

The undisputed evidence in this action shows that the defendant had established the required [disclosure] procedures at the time plaintiff opened his account, and that the defendant did not violate the "notification of changes in the costs of credit" provisions set forth in Rule 10b–16(b). In any event, whatever cause of action plaintiff may have under Rule 10b–16 (assuming *arguendo* that one exists) accrued at the time plaintiff opened his account in April of 1975. In as much as the plaintiff did not file his 10b–16 action within two years of the accrual of his action, plaintiff's action is untimely.

**5.** In *Diamond*, we concluded that the most appropriate Georgia statute of limitations to "borrow" in an action for damages under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 was the two-year limitations period found under the Georgia blue sky law, rather than the four-year period governing common law fraud claims. 709 F.2d at 1421–24.

limitation applies, and alternatively, that continuous violations of Rule 10b–16 occurred, some of which fell within the two-year period.

Rule 10b–16, 17 C.F.R. § 240.10b–16,[6] makes it unlawful for a broker or dealer to extend credit to any customer in connection with any securities margin transaction unless the broker or dealer has disclosed to the customer the terms and conditions by which costs of credit will be imposed.[7] The rule does not create an express private right to enforce the duties it sets forth. Whether there exists a private cause of

6. **§ 240.10b–16 Disclosure of credit terms in margin transactions.**

(a) It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer:

(1) Is given or sent at the time of opening the account, a written statement or statements disclosing (i) the conditions under which an interest charge will be imposed; (ii) the annual rate or rates of interest that can be imposed; (iii) the method of computing interest; (iv) if rates of interest are subject to change without prior notice, the specific conditions under which they can be changed; (v) the method of determining the debit balance or balances on which interest is to be charged and whether credit is to be given for credit balances in cash accounts; (vi) what other charges resulting from the extension of credit, if any, will be made and under what conditions; and (vii) the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required: *Provided, however,* That the requirements of this subparagraph will be met in any case where the account is opened by telephone if the information required to be disclosed is orally communicated to the customer at that time and the required written statement or statements are sent to the customer immediately thereafter: *And provided, further,* That in the case of customers to whom credit is already being extended on the effective date of this section, the written statement or statements required hereunder must be given or sent to said customers within 90 days after the effective date of this section; and

(2) Is given or sent a written statement or statements, at least quarterly, for each account in which credit was extended, disclosing (i) the balance at the beginning of the period; the date, amount and a brief description of each debit and credit entered during such period; the closing balance; and, if interest is charged for a period different from the period covered by the statement, the balance as of the last day of the interest period; (ii) the total interest charge for the period during which interest is charged (or, if interest is charged separately for separate accounts, the total interest charge for each such

account), itemized to show the dates on which the interest period began and ended; the annual rate or rates of interest charged and the interest charge for each such different annual rate of interest; and either each different debit balance on which an interest calculation was based or the average debit balance for the interest period, except that if an average debit balance is used, a separate average debit balance must be disclosed for each interest rate applied; and (iii) all other charges resulting from the extension of .credit in that account: *Provided, however,* That if the interest charge disclosed on a statement is for a period different from the period covered by the statement, there must be printed on the statement appropriate language to the effect that it should be retained for use in conjunction with the next statement containing the remainder of the required information: *And provided further,* That in the case of "equity funding programs" registered under the Securities Act of 1933, the requirements of this subparagraph will be met if the broker or dealer furnishes to the customer, within 1 month after each extension of credit, a written statement or statements containing the information required to be disclosed under this subparagraph.

(b) It shall be unlawful for any broker or dealer to make any changes in the terms and conditions under which credit charges will be made (as described in the initial statement made under paragraph (a) of this section), unless the customer shall have been given not less than thirty (30) days written notice of such changes, except that no such prior notice shall be necessary where such changes are required by law: *Provided, however,* That if any change for which prior notice would otherwise be required under this paragraph results in a lower interest charge to the customer than would have been imposed before the change, notice of such change may be given within a reasonable time after the effective date of the change.

7. Certain disclosures are to be made at the time the account is opened, 17 C.F.R. § 240.10b–16(a)(1); other disclosures are to be made with each account statement (at least quarterly), *id.* at § 240.10b–16(a)(2); and certain types of notifications must be made to the customer before any changes in the method of determining costs of credit can be made, *id.* at § 240.10b–16(b).

action is an open question in the Eleventh Circuit; there is a split among the courts that have determined the issue. *Compare Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534–39 (9th Cir.1984) *and Liang v. Dean Witter & Co.,* 540 F.2d 1107, 1113 n. 25 (D.C.Cir.1976) (implied cause of action exists) *with Establissement Tomis v. Shearson Hayden Stone, Inc.,* 459 F.Supp. 1355, 1361 (S.D.N.Y.1978) (no implied cause of action).

 We need not determine whether there is an implied private cause of action under Rule 10b–16 or whether the statute of limitations bars such an action,[8] because the record in the present case clearly indicates that Drexel Burnham complied with all the disclosure requirements of Rule 10b–16. The district court found that Drexel Burnham had established required disclosure procedures at the time Greenblatt opened his account, and that Drexel Burnham did not violate the "notification of changes in the costs of credit" provisions. *See supra,* n. 4. These findings are overwhelmingly supported by the record, and establish compliance with Rule 10b–16(a)(1) and (b). Furthermore, the monthly account statements sent to appellant, which he admittedly received, contained all information required by Rule 10b–16(a)(2). Therefore, summary judgment was properly granted on the Rule 10b–16 claim.

## B. *RICO Claim*

Title 18 U.S.C. § 1964(c) provides a private, civil cause of action under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962." A person violates RICO only if he participates in a "pattern of racketeering activity" or "collection of an unlawful debt." 18 U.S.C. § 1962. "Unlawful debt" means a debt illegally incurred in a gambling activity, or a debt unenforceable because of usury laws. 18 U.S.C. § 1961(6). A "pattern of racketeering activity" requires at least two predicate acts of "racketeering activity"[9] designated in section 1961(1). 18 U.S.C. § 1961(5).

**8.** Assuming *arguendo* that such a cause of action exists, it could arise only under the enabling statute enacted by Congress, section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and not under the regulation itself. *See Robertson,* 749 F.2d at 535 (private right of action under Rule 10b–16 must be implied under section 10(b)). Section 10(b) deals only with fraud "in connection with the purchase or sale" of securities. 15 U.S.C. § 78j(b). Therefore, violations of Rule 10b–16 may give rise to a private cause of action under section 10(b) only to the extent that the violations arise out of the purchase or sale of securities. Although the regulation goes on to require periodic reports to customers and notification of changed credit terms, the breach of such duties is not actionable, absent a purchase or sale of securities on which to base an implied cause of action under section 10(b).

In the present case, the last purchase or sale of securities out of Greenblatt's margin account occurred in August, 1976, almost seven years before this action was initiated. Therefore, any cause of action arising under section 10(b) and Rule 10b–16 would likely be barred by a Georgia statute of limitations, no matter which potentially applicable statute of limitations is applied.

**9.** 18 U.S.C. § 1961(1) provides that:
"racketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white

---

Appellant's RICO claim alleges that Drexel Burnham participated in a scheme to defraud and obtain money by false pretenses and representations through the mailing of false and misleading monthly account statements to Greenblatt, which statements contained excessive and usurious interest charges imposed without adequate disclosure and contrary to the agreement of the parties and various state and federal laws. The predicate acts alleged in the complaint include mail fraud in violation of 18 U.S.C. § 1341; violations of Rules 10b–5 and 10b–16 under the federal securities laws; and violations of various Georgia statutory and common law provisions (including the usury and securities laws). If proved, such allegations are cognizable under RICO. *See Morosani v. First National Bank of Atlanta,* 703 F.2d 1220 (11th Cir.1983) (allegations of improperly charging excessive interest on loan fall within RICO as a scheme to obtain money by means of false or fraudulent pretenses).

The district court concluded that Greenblatt was collaterally estopped from litigating his RICO claim by the arbitration panel's adverse determination of the facts underlying the claim. The court stated that "[i]n its ruling, the arbitrators specifically found that the defendant was legally entitled to the debit balance as well as all the interest charged on the debit balance. Therefore, the arbitrators found that the defendant did not obtain any money from the plaintiff by false pretenses."

Appellant alleges (1) that the district court improperly permitted arbitration, in that the arbitrable claims were intertwined with the exclusively federal RICO claim; and (2) that giving collateral estoppel effect to the arbitrators' findings infringes on the federal court's exclusive power to resolve RICO claims.

We hold that the district court properly required the arbitration to proceed, and that the arbitration findings preclude appellant from asserting certain predicate acts. However, we agree with the appellant that the arbitration findings do not prevent him from pursuing his RICO claim. Nevertheless, we affirm the grant of summary judgment, because the record indicates that appellant cannot prove any of the predicate acts necessary to maintain his RICO action.

### 1. *Intertwining doctrine.*

The margin agreement signed by Greenblatt provided that any controversy arising under the contract would be settled by arbitration. However, this court has applied the "doctrine of intertwining" in cases involving federal securities claims. That doctrine provides that "when it is impractical if not impossible to separate out non-arbitrable federal securities law claims from arbitrable contract claims, a court should deny arbitration in order to preserve its exclusive jurisdiction over the federal securities act claims." *Sibley v. Tandy Corp.,* 543 F.2d 540, 543 (5th Cir. 1976), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977). Appellant argues that this doctrine should also preclude arbitration of arbitrable contract claims which are intertwined with a RICO claim.

This issue has been rendered moot, since the intertwining doctrine was recently considered and rejected by the Supreme Court in *Dean Witter Reynolds, Inc. v. Byrd,* — U.S. —, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). *Byrd* held that when a complaint raises both federal securities claims and pendent state claims, the Arbitration Act, 9 U.S.C. § 1 *et seq.,* "requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Id.,* 105 S.Ct. at 1241. In view of the Supreme

slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;

Court's holding, the district court properly required the arbitrable state law contract claims to go to arbitration in the present case.[10]

### 2. *Collateral estoppel.*

 There are several prerequisites to the application of collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action. *DeWeese v. Town of Palm Beach,* 688 F.2d 731, 733 (11th Cir.1982). In addition, the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. *Precision Air Parts, Inc. v. Avco Corp.,* 736 F.2d 1499, 1504 (11th Cir.1984). The application of collateral estoppel is committed to the sound discretion of the district court. *DeWeese,* 688 F.2d at 734.

 An arbitration decision can have res judicata or collateral estoppel effect, even if the underlying claim involves the federal securities laws. *Schattner v. Girard, Inc.,* 668 F.2d 1366, 1369 (D.C.Cir. 1981); *Davis v. Chevy Chase Financial Ltd.,* 667 F.2d 160, 172 (D.C.Cir.1981); *see Gardner v. Shearson Hammill & Co.,* 433 F.2d 367, 368 (5th Cir.1970), *cert. denied,* 401 U.S. 978, 91 S.Ct. 1209, 28 L.Ed.2d 329 (1971). When an arbitration proceeding affords basic elements of adjudicatory procedure, such as an opportunity for presentation of evidence, the determination of issues in an arbitration proceeding should generally be treated as conclusive in subsequent proceedings, just as determinations of a court would be treated. Restatement (Second) of Judgments § 84(3) and comment c (1982).

In resolving *Byrd,* —— U.S. ——, 105 S.Ct. 1238, 84 L.Ed.2d 158, the Supreme Court took the opportunity to discuss the application of collateral estoppel when an arbitrable pendent claim is resolved through arbitration prior to a federal court's consideration of a connected, nonarbitrable federal claim. After holding that it was unnecessary to stay arbitration pending the federal proceedings, the Court indicated that federal courts can adequately and effectively protect the federal interest in the federal proceeding by determining the preclusive effect to be given to an arbitration proceeding. *Id.* The Court noted that it is "far from certain that arbitration proceedings will have any preclusive effect on the litigation of nonarbitrable federal claims," *id.,* 105 S.Ct. at 1243 (citing *McDonald v. City of West Branch,* 466 U.S. ——, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984)), and instructed that in framing preclusion rules in this context, courts shall take into account the "federal interests warranting protection." *Id.,* 105 S.Ct. at 1244.

In *McDonald v. City of Branch,* 466 U.S. ——, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), the Supreme Court held that a federal court could not bar a civil rights action brought under 42 U.S.C. § 1983 by affording res judicata or collateral estoppel effect to an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement. *Id.,* 104 S.Ct. at 1804. The Court noted the important federal statutory and constitutional rights that a section 1983 action is designed to safeguard, and concluded that an arbitration proceeding could not provide an adequate substitute for a judicial proceeding in protecting those rights. *Id.* at 1803. The considerations supporting that conclusion were that an arbitrator may not have the expertise or authority properly to enforce section 1983; that the union's interest in controlling the individual grievance in the arbitration proceeding may not be compatible with the individual employee's interest; and that informal arbitrable factfinding is generally not procedurally equivalent to judicial factfinding. *Id.* at 1803–04.

---

**10.** An additional, independent reason for compelling arbitration in the present case was the appellant's delay in adding the federal claims to his complaint and seeking a stay of arbitration.

The *Byrd* and *McDonald* cases indicate that, at least with respect to an important, nonarbitrable federal claim, a federal court should be hesitant to preclude the litigation of the federal claim based on the collateral estoppel effects of a prior arbitration award. These cases indicate a case-by-case approach to determining the collateral estoppel effects of arbitration on federal claims, focusing on the federal interests in insuring a federal court determination of the federal claim, the expertise of the arbitrator and his scope of authority under the arbitration agreement, and the procedural adequacy of the arbitration proceeding.[11]

In the present case, the nature of the RICO claim asserted and the procedural adequacy of the arbitration proceeding persuades us that the factual findings necessary to support the arbitration award should be given collateral estoppel effect in the present judicial proceeding.

Initially, we observe that whether a RICO claim is a "nonarbitrable federal claim" is an open question in this circuit. We note the important federal policies inherent in the enforcement of RICO by the federal courts. *See S.A. Mineracao da Trindade Samitri v. Utah International, Inc.* 576 F.Supp. 566, 574–76 (S.D.N.Y.1983) (concluding that RICO claim is nonarbitrable). However, a RICO claim is unusual in that it must be based on underlying, independently unlawful acts. We do not think it improper to grant collateral estoppel effect to an arbitration panel's factual findings regarding these underlying acts, particularly if such findings are within the panel's authority and expertise.

The nature of the RICO claim asserted in the instant case favors the application of collateral estoppel to the arbitration panel's factfinding. The predicate acts alleged in the RICO claim are essentially an amalgamation of appellant's contractual, state law, and federal securities claims. The contractual and state law allegations (relating to the computation of interest charges on the margin account and the excessiveness of such charges) are the same allegations that were presented to and necessarily decided by the arbitration panel. The determination of those issues was directly within the scope of the contractual arbitration clause and the arbitrators' expertise.[12]

Furthermore, the arbitration procedure in the present case adequately protected the rights of the parties. The arbitration was conducted under the arbitration rules of the New York Stock Exchange. Both parties were represented by counsel, made opening and closing arguments, and were permitted every opportunity to examine and cross-examine witnesses and present relevant evidence. A complete record of the proceedings (transcript and documents) was preserved. In light of the above circumstances, it is entirely appropriate to give collateral estoppel effect to all of the factual determinations which were necessary and critical to the arbitration panel's ultimate award.

The arbitration panel did not make specific factual findings. However, in order to conclude that Drexel Burnham was entitled to the entire debit balance and interest owed on the margin account, the arbitration panel necessarily had to determine that Drexel Burnham had properly calculated and charged interest on the account according to the terms of the agreement; that there was no fraud or deception in the calculation of interest charges; that the monthly account statements contained correctly computed interest charges; and that the interest rates charged were not usurious. Appellant presented evidence on all these issues during the arbitration proceed-

---

11. Of course, the general prerequisites to the application of collateral estoppel, see *supra*, must be met as well.

12. When arbitration is properly commenced under the terms of an arbitration clause in a contract, its outcome is determinative as to all contractual rights and liabilities. *Overseas Motors, Inc. v. Import Motors Ltd.,* 375 F.Supp. 499, 511 (E.D.Mich.1974), *aff'd,* 519 F.2d 119, 123 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

ing, and clearly had a full and fair opportunity to litigate these issues in that proceeding. Therefore, these factual findings are binding on this court, and any contrary allegations in the pleadings will be insufficient to support appellant's RICO claim.

However, in awarding Drexel Burnham the balance owed under the contract, the arbitrators did not necessarily decide whether Drexel Burnham had disclosed to Greenblatt all information it was lawfully required to disclose under the federal securities laws. These issues were not before the panel, and did not need to be addressed in determining Drexel Burnham's contractual right to the balance owed. Since appellant alleged violations of Rule 10b–5 and 10b–16 as predicate acts underlying his RICO claim, the collateral estoppel effects of the arbitration proceeding do not preclude his entire RICO claim. Therefore, we go on to consider whether the predicate acts alleged by appellant raise genuine issues of material fact sufficient to survive a motion for summary judgment.

### 3. *Existence of predicate acts.*

■ Viewing all the evidence in the light most favorable to the appellant, it is obvious that appellant will be unable to prove any predicate acts amounting to "racketeering activity" or "collection of an unlawful debt" as defined in 18 U.S.C. § 1961, and as necessary to sustain a RICO claim.

First, appellant's allegations of extortionate, excessive, and usurious interest charges imposed contrary to the terms of the margin account agreement and state law are barred as predicate acts due to the collateral estoppel effects of the arbitration award.

Second, appellant alleges violations of Rule 10b–16. We have already held that Drexel Burnham complied with all the disclosure requirements of Rule 10b–16. *See supra.*

Third appellant alleges misrepresentations in violation of Rule 10b–5. However,

the RICO claim does not contain any allegations relating to the purchase or sale of securities; therefore, Rule 10b–5 is inapplicable.

This leaves only the allegations that Drexel Burnham committed mail fraud, in violation of 18 U.S.C. § 1341, by mailing false interest statements which miscomputed and charged excessive interest. However, if the interest charges contained in the statements were properly computed under the agreement of the parties (as the arbitration panel determined that they were), and if Drexel Burnham disclosed all items necessary under the federal securities laws (as the record clearly demonstrates), there cannot have been any fraud or improper conduct involved in the mailing of the monthly statements.

In summation, it is clear, from the findings made by the arbitration panel and the record in the present case, that appellant will be unable to prove any of the predicate acts necessary to support a RICO violation. That being so, the district court properly granted summary judgment in favor of Drexel Burnham on the RICO count.

### C. *Pendent Claim for Overcollection*

Appellant alleges that, after the arbitration award, Drexel Burnham confiscated $29,847 out of his margin account, or $2,873 more than the sum of $26,974 awarded in arbitration. The district court did not address this pendent claim.[13] Therefore, we remand this case to the district court for the limited purpose of determining the entitlement to the $2,873 allegedly overcollected.

The decision of the district court is

AFFIRMED in part; and REMANDED in part for further proceedings.

---

**13.** This alleged overcollection of funds was not set out in an independent count in appellant's complaint, but was one of the underlying acts alleged in the RICO count. Nevertheless, this issue was before the district court, and should have been ruled on.