UNIVERSAL AMERICAN BARGE CORP., Plaintiff–Appellee,

v.

J–CHEM, INC., J–Chem, Inc., Etc., et al., Defendants,

Degesch America, Inc., and Fumigators, Inc., Defendants–Appellants.

No. 90–2759.

United States Court of Appeals, Fifth Circuit.

Nov. 12, 1991.

Rehearing Denied Jan. 3, 1992.

Stanley Renneker, Houston, Tex., for Degesch.

Raymond T. Matthews, Bradley Bartlett, Houston, Tex., for Fumigators, Inc.

Ann E. Webb, Eugene J. Silva, Vinson & Elkins, Houston, Tex., for Universal American Barge.

Before REAVLEY, POLITZ and JOLLY, Circuit Judges.

REAVLEY, Circuit Judge:

Barge-owner Universal American Barge Corporation ("Universal") sued corporate relatives J–Chem, Inc., Fumigators, Inc., and Degesch America, Inc., (collectively "the fumigators") for indemnification of damages allegedly caused by the fumigators' negligence or breach of warranty in fumigating cargo under contract with Universal. The district court relied on the final award entered in prior arbitration between Universal and the injured cargo interests to collaterally estop litigation of the fumigators' liability and damages. The district court rejected the fumigators' contention that arguments made by Universal's counsel in the arbitration, which arguments would be prejudicial to Universal's indemnification claim, were conclusively binding judicial admissions. We agree that Universal's position in the arbitration with the cargo owner did not bar its claim against the fumigators, but we reverse the judgment in favor of Universal.

## I. BACKGROUND

In January 1984, the General Authority for Supply Commodities, Cairo, Republic of Egypt ("GASC") solicited bids for carriage of bagged wheat flour from the United States to Egypt. Universal submitted the low bid, but GASC initially objected to Universal's proposed use of a tug/barge unit because that means of carriage increased the risk of insect infestation in the flour. The United States Department of Agriculture ("USDA"), which subsidized the freight, preferred Universal's cheaper means of carriage. Consequently the USDA proposed, GASC insisted, and Universal agreed that Universal would fumigate the cargo at Universal's expense.

Universal awarded the fumigation contract to J–Chem, which proposed fumigation with Phostoxin (aluminum phosphide). After the bagged flour had been loaded, J–Chem fumigated the holds of the Energy Freedom. J–Chem supplied Universal with the appropriate fumigation forms and instructions. A representative of the Federal Grain Inspection Service ("FGIS") witnessed the fumigation and issued a certifi-

cate of approval. But neither J–Chem, Universal, the FGIS or the USDA had experience using Phostoxin to fumigate bagged flour cargo on board a vessel.

The Energy Freedom departed for Egypt on March 11, 1984. On April 9, 1984, in Gibraltar, the barge's hatch covers were opened to aerate the holds and remove Phostoxin residue. The crew saw evidence of a fire in the number three hold, but no sign of an active fire. The hatch covers were replaced and resealed. Approximately four hours later, a "hot spot" was observed near a hatch opening to the number three hold. Approximately 30 hours later, Gibraltar fire authorities had located and extinguished the fire. During the remainder of the voyage, the crew of the Energy Freedom jettisoned roughly 4000 to 5500 damaged bags of flour from the number three hold. The remaining cargo was discharged upon arrival in Egypt.

Because the charterparty between GASC and Universal contained an arbitration clause, Universal instituted an arbitration proceeding claiming payment from GASC, and GASC counterclaimed for cargo damage. Unable to secure personal jurisdiction to compel the fumigators to join the arbitration, Universal tendered them the defense of the arbitration, but the fumigators declined. Universal filed this suit for indemnification in February 1986, while the arbitration was still pending before the arbitral panel.

Universal called the only witnesses in the arbitration, including Universal's owner, its president, its operations manager, and two agricultural experts. The parties developed an extensive documentary record. Universal based its defense in part on 46 U.S.C. 182 ("the fire statute"), which relieves a vessel owner of liability for cargo damage from fire unless the fire was caused by the owner's design or negligence. GASC attempted to establish Universal's negligence. Universal attacked GASC's case, hoping to obtain a finding that the cause of the fire was unknown or speculative. But Universal also may have

realized that if its strategy failed, it would benefit later from a finding of negligence on the part of the fumigators. The arbitral panel heard considerable evidence regarding possible causes of the fire, including misapplication of the fumigant.

On February 27, 1989, the panel returned its final award setting out in detail its factual findings and conclusions. The panel found that Universal had a duty to ascertain the nature and characteristics of Phostoxin and exercise caution in applying it according to the manufacturer's directions, and breached that duty; that the manufacturer's information clearly warned of fire hazard from improper application of Phostoxin, and in fact it was applied contrary to the manufacturer's directions; that Universal knew that neither USDA nor J–Chem had any prior experience in fumigating bagged cargo and that Phostoxin had never before been used on bagged flour cargo in transit; that the fire was caused by the improper application of loose Phostoxin tablets; and that the risk of fire was foreseeable to Universal and therefore the fire was proximately caused by Universal's fault.

The panel also concluded that Universal was responsible for cargo damage in the Energy Freedom's holds that were not affected by fire. As to the quantum of damages, the panel found total cargo damage amounting to $2,347,773.21, plus cargo shortage of $192,557.80, cargo slackage of $3,570.20, sequestering and restacking expenses of $132,929.30, and interest of $1,218,515.00 for a grand total of $3,895,-345.51. This award did not segregate damages attributable to the fire from water damage in non-fire damaged holds. The panel noted that, because of Universal's complete failure "to properly quantify losses and damages," the panel was forced to rely exclusively on GASC's damages records. After obtaining this arbitration award, GASC settled with Universal for $3.5 million.

Universal thereafter filed a motion for partial summary judgment[1] in its district

1. This motion addressed only the cargo damage and related claims, but did not concern Universal's direct claims against the fumigators for, *inter alia,* barge damage and lost freight.

court action against the fumigators, supported principally by the arbitration final award and evidence of the settlement with GASC. The fumigators also filed their own motion for summary judgment, contending that Universal's defensive arbitration posture under the fire statute, that the fire cause was unknown, bound Universal conclusively in the district court. The court granted Universal's Motion, concluding that estoppel was properly applied to preclude litigation of the fumigators' fault, and that Universal was entitled to indemnification from the fumigators in the amount of $3.5 million, plus attorneys' fees of $194,023.04, plus prejudgment interest. The fumigators' motion was denied.

## II. COLLATERAL ESTOPPEL AGAINST THE FUMIGATORS

A. ARBITRATION AND THE REQUIREMENT OF FULL AND FAIR LITIGATION

■ The fumigators contend on appeal that the district court's grant of summary judgment violated their right to a full and fair hearing on their opposition to Universal's claims because the court enforced against them a decision resulting from arbitration even though they were not party to the arbitration or the agreement mandating arbitration, and did not consent to be bound by the arbitration. Universal cites *SCAC Transport (USA), Inc. v. S.S. "Danaos"*, 845 F.2d 1157 (2d Cir.1988) in arguing for preclusion of issues previously litigated in arbitration against a party "vouched in" to the arbitration who chooses not to defend.[2] We believe that due process may be accorded a party "vouched in" to an arbitration.

■ "[A] right, question, or fact distinctly put in issue and directly determined as a ground of recovery by a court of competent jurisdiction collaterally estops a party … from relitigating the issue in a subsequent

action," if the party had reasonable notice and an opportunity to be heard against the claim. *Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334, 338 (5th Cir.1982) (footnote omitted). But the due process clause of the United States Constitution protects the right to a full and fair hearing on an issue, and therefore collateral estoppel cannot be applied against a party as to issues not fully and fairly litigated. *Blonder–Tongue Lab., Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332, 99 S.Ct. 645, 652, 58 L.Ed.2d 552 (1979); *Hardy*, 681 F.2d at 338.

■ Preclusion of a previously-litigated issue under the doctrine of offensive collateral estoppel requires that the issue under consideration be identical to the issue previously litigated; that the issue was fully and vigorously litigated in the primary proceeding; that the previous determination of the issue was necessary for the judgment in that proceeding; and that no special circumstances exist that would render preclusion inappropriate or unfair. *Parklane Hosiery*, 439 U.S. at 326–32, 99 S.Ct. at 649–52; *In re Lewisville Properties, Inc.*, 849 F.2d 946, 949 (5th Cir.1988).

■ The fumigators challenge application of offensive collateral estoppel because the primary determination was rendered in an arbitration proceeding, rather than in a "court of law." That challenge fails. The United States Supreme Court declined to bar the offensive use of collateral estoppel from arbitration in subsequent federal court litigation, though the Court required consideration of the "federal interests warranting protection." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223, 105 S.Ct. 1238, 1244, 84 L.Ed.2d 158 (1985). In an arbitrable case not directly involving federal statutory or constitutional rights,[3]

---

**2.** Vouching in is a process whereby a civil defendant notifies a nonparty that a suit is pending against the defendant and that if liability is found, the defendant will look to the vouchee for indemnity and hold him to the findings in that suit. *Humble Oil & Refining Co. v. Phila-* *delphia Ship Maintenance Co.*, 444 F.2d 727, 735 n. 14 (3rd Cir.1971).

**3.** A case involving federal civil rights, for example, might raise federal interests warranting the arbitral preclusion bar. In *McDonald v. West Branch*, 466 U.S. 284, 292, 104 S.Ct. 1799, 1804,

courts should use a case-by-case approach to determining the collateral estoppel effects of arbitral findings. *See Greenblatt v. Drexel Burnham Lambert, Inc.,* 763 F.2d 1352, 1361 (11th Cir.1985) (courts should consider, *inter alia,* the procedural adequacy of the arbitration proceeding).

It is true that arbitral findings typically lack the supervisory scrutiny of authoritative review, giving rise to the argument that arbitration risks determinations based on irrelevant or hearsay evidence, or the personal whims of arbitral panel members. Hulbert, *Arbitral Procedure and the Preclusive Effect of Awards in International Commercial Arbitration,* 7 *Int'l Tax & Bus.Law.* 156, 195 (1989) [hereinafter "Hulbert"]. However, arbitration is a widely-used means of resolving maritime disputes. *See SCAC Transport,* 845 F.2d at 1163 (citing Feinberg, *Maritime Arbitration and the Federal Courts,* 5 *Fordham Int'l L.J.* 245 (1982); G. Gilmore & C. Black, *The Law of Admiralty* 196 (2d ed. 1975)) (arbitration is "especially important" and has largely supplanted litigation in maritime dispute resolution). And we assume that rational actors fearing future disagreement would not contract for a biased forum to settle their differences. *See* Shell, *Res Judicata and Collateral Estoppel Effects of Commercial Arbitration,* 35 *U.C.L.A.L.Rev.* 623, 663–64 (1988) [hereinafter "Shell"].

■ The application of collateral estoppel from arbitral findings is a matter within the broad discretion of the district court, *Parklane Hosiery,* 439 U.S. at 331, 99 S.Ct. at 651; *Lewisville Properties,* 849 F.2d at 949; *Hauser v. Krupp Steel Producers, Inc.,* 761 F.2d 204, 207 (5th Cir.1985), and a district court's discretion in deciding whether to give arbitral findings preclusive effect also keeps the risk of prejudice at an acceptable level, at least when the arbitral pleadings state issues clearly, and the arbitrators set out and explain their findings in a detailed written memorandum. *Cf.* Shell,

*supra,* at 649 (ambiguity of pleadings may require relitigation); Hulbert, *supra,* at 197 (absence of written findings and reasons makes preclusion impossible unless necessarily implied from the nature of the claim and award).

### B. FAIRNESS OF ARBITRAL PROCEDURES

The fumigators raise no charge of bias or improper use of evidence by the arbitrators. The examination that occurred during the qualification of this arbitral panel establishes that the arbitrators were experienced and disinterested individuals. But the fumigators urge that arbitration would have failed to afford them a full and fair opportunity to present their case. They say that the limitations on pretrial discovery and their inability to call witnesses of their choosing, to conduct cross-examination, and to challenge the admissibility of evidence prejudiced them. *See* Hulbert, *supra,* at 193–95 (analysis of preclusive effect depends upon the significance attached to procedural differences between arbitration and court adjudication); *Restatement (Second) of Judgments,* § 57 & cmt. c (1982) [hereinafter "section 57"] (arbitral award should have the same preclusive effect as a judgment if arbitration afforded [procedural] opportunity ... substantially similar in form and scope to court adjudication).

■ If the first determination of an issue occurred in an arbitration which afforded litigants the "basic elements of adjudicatory procedure," a district court may find in a proper case that the arbitral award collaterally estops relitigation of the previously determined issues. *Greenblatt,* 763 F.2d at 1360. A district court in exercising its discretion must carefully consider whether procedural differences between arbitration and the district court proceeding might prejudice the party challenging the use of offensive collateral estoppel.

■ The district court specifically must determine whether procedural opportuni-

80 L.Ed.2d 302 (1984), the Supreme Court held that collateral estoppel effects of collective-bargaining arbitration could not bar a subsequent civil rights action under 42 U.S.C. 1983 because of the important federal nature of the rights

involved. But the Court also discussed a potential conflict of interest between union goals and individual member rights, as well as certain differences in arbitral procedure. *Id.,* 104 S.Ct. at 1803–04.

ties available to the party in the subsequent action "might be likely to cause a different result." *Parklane,* 439 U.S. at 332, 99 S.Ct. at 652. But a party who chooses not to appear in a proceeding despite having notice and an opportunity to be heard, and who later challenges the preclusive effect of determinations made in the proceeding, must make a particularized showing of harm to establish the prejudicial effect of procedural differences. *See SCAC Transport,* 845 F.2d at 1163 (opponent of collateral estoppel has burden to demonstrate specific prejudice from arbitral procedures); *but see also* Carlisle, *Getting a Full Bite at the Apple: When Should the Doctrine of Issue Preclusion Make an Administrative or Arbitral Determination Binding in a Court of Law,* 55 *Fordham L.Rev.* 63 (1986) (suggesting burden should rest with the proponent of preclusion).

■ The fumigators argue that some evidence introduced by GASC on liability and damages would have been subject to hearsay objection, and that the fumigators would have cross-examined the witnesses if the proceeding occurred in district court. The fumigators also complain that the parties to the arbitration did not call witnesses favorable to the fumigators' position. But the fumigators do not point to any specific arbitral procedures that would have prevented their making hearsay objections and calling their own witnesses, had they chosen to appear. Their complaints thus result from their rejection of the vouching notice, not from any identified procedural differences between arbitration and district court.

The fumigators also argued in a hearing before the district court that their discovery would have been compromised in arbitration, where the arbitral panel controls the scope and extent of discovery, while in district court they would have enjoyed an unfettered right to conduct discovery. In rejecting this contention, the district court noted it has authority to entertain and grant motions to quash, and thus at least as much power as arbitrators to limit discovery. In their briefs on appeal, the fumigators fail to identify any allowable district court discovery that would be denied them under the discovery rules pertaining to arbitration. In fact, the fumigators make only vague allusions to procedural differences in discovery between this arbitration and district court, and we are unable to ascertain from the briefs that such differences even exist. The fumigators have not made a particularized showing of harm.

### C. Vouching and Adequate Representation

The fumigators also contend that it was unfair to use collateral estoppel against them because they were vouched in to an arbitration despite having no duty to indemnify or defend Universal. Even if they were properly vouched in, the fumigators say that their interests were not adequately represented in the arbitration and therefore the district court's application of collateral estoppel was improper. We reverse the judgment for the reason that Universal could not have represented the fumigators' interests in the arbitration.

■ Vouching is a common-law device whereby a defendant notifies the "vouchee," a nonparty alleged indemnitor,

(a) of the pendency of the suit against him; (b) that if liability is found, the defendant will look to the vouchee for indemnity; (c) that the notice constitutes a formal tender of the right to defend the action; and (d) that if the vouchee refuses to defend, it will be bound in any subsequent litigation between them to the factual determinations necessary to the original judgment.

*Humble Oil,* 444 F.2d at 735. Vouching helps to avoid duplicative litigation and the risk of inconsistent results in adjudicating indemnification claims. *See SCAC Transport,* 845 F.2d at 1162 (explaining utility of vouching). Vouching is reserved primarily for cases in which the vouchee cannot be impleaded because the vouchee is not subject to personal jurisdiction. *Humble Oil,* 444 F.2d at 735 n. 15; 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure*

§ 4452 at 445–46. An alleged indemnitor who is vouched in to a court proceeding may be subject to having the prior determination used against the vouchee in the subsequent indemnification action even if the vouchee does not appear and defend in the first action. *Wisconsin Barge Line Inc. v. The Barge Chem 300,* 546 F.2d 1125, 1128 (5th Cir.1977); *Odd Bergs Tankrederi A/S v. S/T Gulfspray,* 650 F.2d 652, 654 (5th Cir.1981).

■ Generally, once the alleged indemnitor is vouched in, the vouchee must choose either to appear and defend or to decline the tender, though the vouchee must make this choice without the benefit of an authoritative determination of the primary defendant's right of indemnification. If the vouchee declines, the vouchee loses certain prerogatives in any subsequent indemnification action brought by the primary defendant, and results of the primary lawsuit may be binding in the subsequent action. For example, the alleged indemnitor may not contest the validity of the primary defendant's liability to the injured party. He may contest only whether notice was sufficient, whether he has a duty to indemnify, and whether the prior judgment was obtained by fraud or collusion. *See generally* Comment, *Due Process Constraints on Vouching as a Device to Bind Non–Parties,* 14 *Colum.J.L. & Soc.Probs.* 189, 192 (1978) (describing typical mechanics of common-law vouching); Wright, Miller & Cooper, *supra,* at 440–41 (same).

■ This court recognizes vouching as a valid procedural device. *Odd Bergs,* 650 F.2d at 654; *Wisconsin Barge,* 546 F.2d at

1128. In this case, vouching procedure gave the alleged indemnitors adequate notice and the opportunity to be heard in the primary action. In light of what we have said about issue preclusion from arbitration, we find no reason to apply a different rule when the alleged indemnitor is vouched in to an arbitration as opposed to a court proceeding, assuming that a district court is convinced that the arbitration fully and fairly litigated the issues to be precluded.

But there is a potential problem with applying collateral estoppel against a party who was vouched in but did not appear to defend. The district court thought that the defendant in the primary action, who vouches in his putative indemnitor, has no duty whatsoever to defend the interests of the indemnitor in order to obtain the benefit of subsequent preclusion as to issues relevant to the indemnitor's liability.[4] In some cases, therefore, those issues will not be fully and fairly litigated. Other authorities express similar concerns because, *inter alia,* a conflict of interest between the indemnitor and the indemnitee could interfere with full and fair litigation of issues.

## D. Vouching and Conflict of Interest

■ Section 57 has guided this court's application of issue preclusion to indemnification suits such as this, involving no contractual duty to defend.[5] *Wisconsin Barge,* 546 F.2d at 1128 & n. 1. When an indemnitor is vouched in to an action with reasonable notice and an opportunity to defend, a judgment against the indemnitee ordinarily has several effects in a subsequent action for indemnification:

---

**4.** Some authorities support this view. *Wisconsin Barge,* 546 F.2d at 1128 n. 1, so states in reliance on *Restatement of Judgments,* section 107, cmt. f. But the traditional vouching principles set out in section 107 were thoroughly reformulated by section 57. Wright, Miller & Cooper, *supra,* at 443. Although Professors Wright, Miller & Cooper refer to section 57 as embodying a "representational" vouching theory, they note that section 57 did not affirmatively suggest an absolute duty to defend on the indemnitee urging collateral estoppel, nor a mandate of adequate representation, where no contract creates such a duty. Section 57 would, however, clearly forbid preclusion of issues that

were tainted by conflict of interest between the indemnitee and the indemnitor in the first proceeding. *Id.*

**5.** Some authorities think that an indemnitor whose contract with the indemnitee includes a promise to defend the indemnitee, and who breaches that promise, should have relitigation of any previously-determined issues precluded. *See, e.g.,* Wright, Miller & Cooper, *supra,* at 443–44 (indemnitor's breach of independent contractual duty to defend may preclude relitigation of any issue, including the existence of a duty to indemnify).

(a) The indemnitor is estopped from disputing the existence and extent of the indemnitee's liability to the injured person; and

(b) The indemnitor is precluded from relitigating issues determined in the action against the indemnitee if: ... (ii) the indemnitee defended the action with due diligence and reasonable prudence.

Section 57(1). But a conflict of interest between the indemnitee and the indemnitor would preclude the indemnitor from accepting the defense of the indemnitee in the primary action, and would compromise the indemnitee's defense of the indemnitor's interests. Conflict occurs "when the injured person's claim against the indemnitee is such that it could be sustained on different grounds, one of which is within the scope of the indemnitor's obligation to indemnify and another of which is not." *Id.* In that event, estoppel precludes only those issues in the indemnity action as to which

(a) there was no conflict of interest between the indemnitee and the indemnitor; and

(b) the indemnitee conducted a defense with due diligence and reasonable prudence.

Section 57(2); *see also SCAC Transport,* 845 F.2d at 1163 (indemnitor bound only when its interests "have been adequately represented ... by the indemnitee"); *Jamaica Commodity Trading Co. v. Connell Rice & Sugar Co.,* 766 F.Supp. 138, 151 (S.D.N.Y.1991) (no collateral estoppel if party seeking preclusion "could not reasonably forward [the absent party's] arguments without exposing itself to liability"); Wright, Miller & Cooper, *supra* (explaining difficulties created by conflict of interest under the "representational" model of preclusion).

We think that the *Parklane* requirement that the defendant in the first action have incentive in that action to litigate the lawsuit fully and vigorously also mandates conflict-free representation of issues sought to be precluded. 439 U.S. at 332, 99 S.Ct. at 652. For an issue to be vigorously litigated, opposing interests must diligently contest the issue. A defendant having a conflict of interest with a putative indemnitor on a particular issue cannot contest that issue diligently in the *Parklane* sense.

■■■■ This case presents an additional complication. Common-law vouching practice permits the vouchee to contest the basis and scope of indemnification in the second action. *See, e.g., Humble Oil,* 444 F.2d at 735, *citing Barber–Greene Co. v. Bruning Co.,* 357 F.2d 31, 34 (8th Cir.1966) (indemnitor's liability generally remains to be proved in the indemnification action). But a vouchee may not relitigate in the indemnification action an issue properly determined in the first proceeding merely because it is arguable that he had no duty to indemnify. *See* section 57, cmt. b. So the combination of these two principles requires that the court contemplating preclusion consider together (1) the scope of the putative indemnitor's duty, under whatever theory is properly available to the indemnitee, and (2) the existence in the first proceeding of any liability claims against the indemnitee which fall outside the scope of indemnification, thus raising issues tainted by conflict of interest and requiring relitigation.

■■■ In sum, an alleged indemnitor who is vouched in to the primary action but declines to defend is bound by the findings in that action, but only as to those unconflicted issues on which its interests were adequately represented in the action. *SCAC Transport,* 845 F.2d at 1162; Wright, Miller & Cooper, *supra,* at 444; *see also Jamaica Commodity Trading,* 766 F.Supp. at 150–51. Adequate representation makes sure that the issues of shared concern to the indemnitee and indemnitor alike are actually and fully litigated. *See* Wright, Miller & Cooper, *supra* (default judgment ordinarily will not bind the indemnitor). The district court did not analyze the issues of conflict of interest or adequate representation because it thought Universal had no duty to represent the fumigators' interests.

■■■ In deciding whether a conflict existed between Universal and the fumigators in the arbitration, and whether representation was adequate, we must consider

briefly Universal's theories of indemnification and the issues raised thereby, along with the issues raised by the injured party's claims in arbitration, to decide whether any of the latter are outside the scope of indemnification. If so, then the indemnitee has no recourse to collateral estoppel to preclude subsequent litigation of the issue, and summary judgment in this case is inappropriate. Because we find potential conflict between Universal and the fumigators pervasively present in the arbitration, we do not consider whether Universal's representation was adequate.

■ Universal's indemnification action asserts claims based on the warranty of workmanlike performance ("WWLP") implied in all maritime contracts under *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956),[6] and on common-law tort indemnification principles as expressed in *Wisconsin Barge*, 546 F.2d at 1128. A contractor's breach of the WWLP is within the scope of its indemnification of the vessel owner, but may be excused by negligence of a certain type on the part of the owner. *Bosnor*, 796 F.2d at 784; *Bass*, 749 F.2d at 1167. Common law indemnification also makes owner negligence a defensive issue. *Wisconsin Barge*, 546 F.2d at 1128.

A conflict of interest arose in the arbitration because GASC pleaded Universal's independent negligence as a theory of recovery in the arbitration.[7] Because GASC's suit raised independent negligence, as opposed to mere negligent hiring of J–Chem, the conflict divided Universal and the fumigators on issues of fault. The fumigators could not be expected to vouch in and defend Universal against a claim based on Universal's negligence because, under either indemnification theory pleaded, Universal's negligence is outside the scope of indemnification.[8] A finding of Universal's negligence could relieve the fumigators from liability, so the fumigators could defend themselves by shifting liability to Universal. And Universal could not effectively represent both itself and the fumigators because, in order to represent the fumigators, Universal would in essence have to shift liability to its own shoulders by arguing its own negligence. We are convinced that Universal charted its course through the arbitration with one eye fixed upon this indemnification suit.

The issues of proximate cause and damages allocation also were tainted with the same type of conflict in the arbitration. Universal here seeks full indemnification from the fumigators for money paid in settlement of all GASC's claims. However, the arbitral pleadings reflect considerable argument over the cause of certain items

6. We note that the *Ryan* approach to indemnification has been questioned if not wholly displaced as the appropriate model for indemnification of cargo damage. *Bosnor, S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776, 785 (5th Cir. 1986) (doubting continued vitality of the *Ryan* approach outside the personal injury context); *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1167 (5th Cir.1985) (same); *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096, 1100 (5th Cir. Unit A 1981) (same).

7. Our examination of the arbitral hearings reveals that GASC believed that the fire statute required proof of Universal's personal negligence in order for Universal to be liable to GASC. The arbitral hearings and the briefs GASC submitted in support of its requested arbitral award raise several forms of owner negligence in connection with fire damage, including Universal's failure to fulfill its independent duty to investigate the flammability characteristics of Phostoxin; its failure to read user materials regarding flammability supplied by J–Chem; its failure to allow the Phostoxin fumigation process to run its course before departing Houston; its failure to anticipate potentially dangerous moisture condensation within the Energy Freedom's holds as the barge sailed from cooler to warmer climates; its delay in obtaining the assistance of the Gibraltar fire authorities; and its failure to promptly move fire-damaged cargo to minimize contamination of nondamaged cargo. GASC also forcefully took the position that Universal's representative was ultimately or jointly responsible with the fumigators for the actual decision to select Phostoxin as the fumigating agent. At one juncture, the arbitral panel stated its belief, correct or otherwise, that Universal would have recourse to the fire statute's protection if Universal could prove that the fire was caused by J–Chem's agents.

8. While the quantum of negligence to make out the defense may be different for tort as opposed to implied warranty indemnification, indemnitee negligence in some form is directly in issue under both theories.

of damages, argument occasioned, we assume, by the fire statute which would require segregation of fire-related damages, by GASC's contention that certain acts of Universal exacerbated damages, by GASC's contention that Universal was responsible for shorting, and by Universal's contention that cargo was damaged, miscounted or infested during discharge in Egypt. The fumigators' possible arguments regarding proximate cause and damages had no voice in the arbitration.

We do not believe, however, that there is any genuine issue of material fact regarding the cause-in-fact of the fire. We think that the evidence establishes that the settling and shifting of cargo during transport caused loose Phostoxin tablets to pile up and generate sufficient heat in the course of their chemical transformation to ignite nearby flammable materials. While excessive moisture also may ignite Phostoxin, only speculative testimony tended to show that any dangerous level of condensation, above that required to stimulate Phostoxin's expected fumigant effects, actually occurred within the holds. We do not believe a conflict could exist in the arbitration on an issue with no colorable grounds for dispute.

### III. JUDICIAL ADMISSIONS BY UNIVERSAL

■ The fumigators urged in their summary judgment motion that Universal henceforth is conclusively bound by its argument in the arbitration, pursuant to the fire statute defense, that the cause of the fire on board the Energy Freedom is unknown. The fumigators contend the argument, contained in pleadings and statements of counsel, is a judicial admission. Because the fire statute requires dismissal of any claim based on a fire at sea whose cause is purely speculative, *Westinghouse Elec. Corp. v. M/V "Leslie Lykes"*, 734 F.2d 199, 214 (5th Cir.), *cert. denied*, 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984), Universal's claims against the fumigators must fail if Universal is conclusively bound by the "unknown cause" argument.

The admissions of Universal's counsel in the arbitration may be admissible in the district court over hearsay objection, as statements of a party opponent. *See, e.g., Hanson v. Waller*, 888 F.2d 806, 814 (11th Cir.1989) (hearsay exception for statements by agent of party opponent includes statements by attorney in representational capacity). But judicial admissions are not conclusive and binding in a separate case from the one in which the admissions were made. *State Farm Mut. Auto Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968). Since Universal's admissions in arbitration as to the cause of the fire were not conclusively binding in the separate district court suit, the admissions were sufficiently contradicted by Universal's summary judgment evidence to raise a genuine issue of material fact. The district court did not err in denying the fumigators' Motion.

### IV. CONCLUSION

We recapitulate. A district court, in the exercise of its discretion, may preclude relitigation of issues previously determined in an arbitration if the court finds, under the facts of that case, that the arbitral procedures afforded due process, that the requirements of offensive collateral estoppel are met, and that the case raises no federal interests warranting special protection. Further, a putative indemnitor may be vouched in to an arbitration, and may suffer issue-preclusive effects from arbitral findings under the offensive collateral estoppel rules peculiar to vouching, if the indemnitor declines to appear in the arbitration. But offensive collateral estoppel is not available as a matter of law on any issue that was tainted by conflict of interest between the putative indemnitor and indemnitee in the arbitration.

We reverse the judgment in favor of Universal. The fumigators were properly vouched in to the arbitration, at least to the limited extent that Universal now may preclude relitigation of Universal's liability to GASC, the quantum of damages, and the cause-in-fact of the fire aboard the Energy Freedom. But, as to the interrelated is-

sues of fault and duty to indemnify, and the issue of damages apportionment, Universal must now contest those issues anew in the district court because they have not yet been fully and fairly litigated. The case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.