**BARBER–GREENE COMPANY, an Illinois Corporation, Appellant,**

v.

**The BRUNING COMPANY, a Nebraska Corporation, Appellee.**

No. 17932.

United States Court of Appeals
Eighth Circuit.

Feb. 18, 1966.

Patrick W. Healey, Lincoln, Neb., for appellant and filed printed brief with George Healey, Lincoln, Neb.

Flavel A. Wright, of Cline, Williams, Wright, Johnson, Oldfather & Thompson, Lincoln, Neb., for appellee.

Before VAN OOSTERHOUT, BLACKMUN and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

In this Nebraska diversity suit Barber-Greene Company seeks indemnity from The Bruning Company in the amount of $19,153.50.

Warren B. Grace, a truck driver, was injured on May 29, 1957, when he was sprayed by hot asphalt from a mixing plant on his employer's premises in Ash-land, New York. This plant was built by plaintiff Barber. It embodied a patented coupling device, or "quick disconnect coupler", manufactured by the defendant Bruning. The coupling was installed in the plant's hydraulic system which controlled the amount of asphalt in the mixture it produced.

On June 17, 1959, over two years after the accident but still prior to the institution of any suit by Grace, Barber, by letter, notified Bruning of the accident and attributed it to "the malfunction of a Bruning SU500 quick disconnecting coupler" in the asphalt plant. The letter mentioned the possibility of litigation and Barber's expectation of indemnification from Bruning in the event of a judgment against Barber. In late December 1959 Barber's attorneys wrote Bruning that a summons had been served on Barber in an action instituted by Grace in the Supreme Court of Chemung County, New York; that they were not then sure of the nature of the action; that they believed that it related to personal injuries sustained by Grace "when it is claimed that an asphalt mixing machine or plant failed to properly function"; that such failure "was entirely due to a coupling sold by your company to Barber-Greene Company"; that if this assumption proved to be correct, Barber will demand that Bruning "come in and defend the above action and indemnify" Barber; and that Barber "hereby offers to your company the control of the defense of the above action".

About sixteen months later, in April 1961, Barber's attorneys, by letter, advised Bruning that Grace had served his complaint on Barber; that this disclosed that the basis of the action "is the claimed malfunction of the asphalt mixing machine or plant"; that an answer had been served; that Barber demanded that Bruning defend the action and indemnify Barber against any judgment that may be rendered against it; and that Barber offered Bruning "the entire control of the defense of this action". Copies of the summons, complaint, and answer, and of a demand for a bill of

particulars accompanied that letter to Bruning. Bruning was never served with a bill of particulars.

Thus, Bruning three times received notice of the action and of Barber's intention to seek indemnity and was clearly given the opportunity to defend. It received notice before any process was served on Barber. It received notice after the summons was issued. And it received notice again after the complaint was served. Bruning, however, did not go into the New York action and defend it.

Grace's New York complaint against Barber alleged that Barber "negligently and carelessly designed, manufactured, constructed, inspected and installed the aforesaid Barber-Greene machine"; that "due to a defect in said machine not known or reasonably discoverable by plaintiff, it failed to operate in accordance with its plans and specifications"; that the machine "was not equipped with an adequate or any safety device to prevent the said machine from spraying hot asphalt and similar materials upon the plaintiff"; and that Barber "failed to reasonably inspect the same".

The New York case proceeded to trial. A jury was waived. The trial resulted in a judgment for Grace against Barber in the amount of $16,231.85. The judge, in his accompanying memorandum, found "that such asphalt mixing machine was so manufactured by the defendant incorporating therein a quick-change coupling manufactured by The Bruning Company with the knowledge that such machine, by its very nature, would be dangerous to users thereof if it did not operate according to its design and the purposes for which it was intended * * that such machine, through a defect in the Bruning coupling so incorporated therein, caused an excessive amount of hot asphalt to collect in the pugmill and to be cast upon the plaintiff * * * that such Bruning coupling was improperly designed and manufactured * * * and that the plaintiff, by reason of the negligence of the defendant in using such coupling and without any negligence on

his part, suffered * * *." Barber paid the judgment. It also incurred expenses of $2,921.65 in defending the action. The judgment and these expenses make the $19,153.50 total which is the subject of the present suit.

In the Nebraska federal trial Barber, over objection, placed in evidence the transcript of the New York litigation and its accompanying exhibits, a pretrial deposition of Bruning's president offered as admissions against interest, proof of Barber's payment of the Grace judgment and the expenses, and the testimony of its vice president and director of engineering. Bruning submitted the testimony of two of its officers.

Chief Judge Robinson, in a memorandum supporting his judgment for the defendant Bruning, found that Barber had established, on Bruning's part, under the Uniform Sales Act, R.R.S.Neb.1943, §§ 69–412 and 69–415, "an implied warranty, if not express warranty, of fitness, upon which Barber would be privileged to rely in the purchase" of couplings from Bruning; that Barber "apparently relied at least to some extent on the representations made by the defendant concerning its product"; and that "an indemnity relationship existed between the plaintiff and the defendant". He described the next step, however, as whether "the injury sustained and subsequent [New York] judgment rendered came within the scope of such indemnity".

The court observed that "More than one theory existed for holding Barber-Greene liable in the New York suit"; that the exploitation of these theories would have been to Bruning's best interests in order to escape its own liability; that its position "as defender in the New York case would have been a compromising one indeed"; that Barber, as indicated by its notices, "expected Bruning to take over the entire defense of the action"; and that Bruning was not required to do this. It also noted "that the defense of the case in New York was tendered in a somewhat less than adequate fashion so far as this de-

fendant is concerned"; that no witness was called by Barber from Bruning in the New York case to explain the design and function of the coupling; that there was lengthy testimony as to such design and function in the subsequent Nebraska trial; that from this testimony "one would virtually have to conclude" that any failure on the part of the coupling was not due to design but "to factors such as improper use or abuse"; and that the defense in the New York suit "was not handled in good faith" so far as Bruning was concerned.

■ Barber urges, and we can of course accept, the general propositions that one "compelled to pay damages on account of the negligence * * * of another" has "a right of action against the latter for indemnity, provided they are not joint tort-feasors in such sense as to prevent recovery", 42 C.J.S. Indemnity § 21, pp. 596–597 (1944), and that this rule has application to a supplier whose negligence has rendered his product dangerously defective for its intended use and has resulted in liability on the part of one who used the product in justifiable reliance upon the supplier's care, Restatement, Restitution § 93(1) (1937), Maryland Cas. Co. v. Independent Metal Prod. Co., 99 F.Supp. 862, 869 (D.Neb.1951), aff'd 203 F.2d 838 (8 Cir. 1953). It is essential, however, that the one sought to be held as an indemnitor be primarily responsible for the negligence which caused the injury. 42 C.J.S. Indemnity § 23 (1944); 27 Am.Jur. Indemnity § 18 (1940). See Pacific Nat'l Ins. Co. v. Transport Ins. Co., 341 F.2d 514, 519 (8 Cir. 1965), cert. denied 381 U.S. 912, 85 S.Ct. 1536, 14 L.Ed.2d 434. Further, it is said that where the one responsible is duly notified of the pendency of the suit and full opportunity is afforded him to defend the action, the judgment, if free of fraud and collusion, is conclusive against him. 27 Am.Jur. Indemnity § 35 (1940); 42 C. J.S. Indemnity § 32 (1944); Washington Gas Light Co. v. District of Columbia, 161 U.S. 316, 329–330, 16 S.Ct. 564, 40 L.Ed. 712 (1896); Aluminum Co. of America v. Hully, 200 F.2d 257, 262 (8 Cir. 1952); Metcalf v. Hartford Acc. & Indem. Co., 176 Neb. 468, 126 N.W.2d 471, 476 (1964); Hessler v. Hillwood Mfg. Co., 302 F.2d 61 (6 Cir. 1962); Liberty Mut. Ins. Co. v. J. R. Clark Co., 239 Minn. 511, 59 N.W.2d 899, 904–905 (1953).

■ These general principles are not really at issue in the present appeal. What is at issue is the application, upon the facts here, of another rule, subordinate but nevertheless valid and established, namely, that the liability of the alleged indemnitor—except in those instances where the successive warranties or other bases for responsibility are identical—remains to be proved in the indemnity action and is not necessarily concluded by the result of the injured person's suit against the one claiming to be an indemnitee. "Robbins is not, however, estopped from showing that he was under no obligation to keep the street in a safe condition, and that it was not through his fault the accident happened". Chicago City v. Robbins, 67 U.S. (2 Black) 418, 423, 17 L.Ed. 298 (1863). See also City of Lincoln v. First Nat'l Bank, 67 Neb. 401, 93 N.W. 698, 699 (1903); Scott v. Curtis, 195 N.Y. 424, 88 N.E. 794, 796 (1909).

■ The notices to Bruning, as we have pointed out, were very broad in their content. Bruning was offered "the entire control of the defense" in the final and vital notice of April 1961. Although the 1959 pre-complaint notices from Barber to Bruning were necessarily indecisive and intimated that the litigation would focus on malfunction of the Bruning coupling, the sole post-complaint notice was directed to alleged malfunction of "the asphalt mixing machine or plant", that is, the entire and substantial Barber-Greene manufactured unit. It was not directed to the Bruning coupling alone. Indeed, Grace's complaint itself, a copy of which accompanied the 1961 notice to Bruning, was not restricted to the coupling but related to negligent design, manufacture, construction, inspection and installation of the "Barber-

Greene machine" and to a defect therein not known to Grace. There was, in fact, no mention in the complaint of Bruning or of a coupling.

Bruning thus was placed in a position where demand was made upon it to defend the Grace action on the broadest possible base and one not at all restricted to the area of its coupling responsibility. Any causative non-coupling defect in the large asphalt plant should not result in liability on Bruning's part. Bruning's posture was one necessarily and sweepingly antagonistic to Barber and was not merely that of one party in a primary-secondary relationship. Bruning's best defense, apart, perhaps, from contributory negligence on Grace's part, would have been to pin responsibility for the accident on some feature of the plant other than the coupling. It was a situation where, even though Bruning were to appear in the New York action and successfully defend its coupling, a judgment in Barber's favor would not necessarily be the result. Bruning thus could not consistently defend both Barber's interests and its own. Under these circumstances, Bruning had no obligation to defend the New York action and is free to defend itself in the indemnity action against any claim of negligence on its part.

Comparable situations appear in Keller v. City of Fargo, 49 N.D. 562, 192 N. W. 313, 316 (1923); H. P. Cummings Constr. Co. v. Marbleloid Co., 51 F.2d 906, 908–909 (3 Cir. 1931); Stout v. Grain Dealers Mut. Ins. Co., 307 F.2d 521 (4 Cir. 1962); Farm Bureau Mut. Auto. Ins. Co. v. Hammer, 177 F.2d 793, 799–801 (4 Cir. 1949), cert. denied 339 U.S. 914, 70 S.Ct. 575, 94 L.Ed. 1339; and Pfarr v. Standard Oil Co., 165 Iowa 657, 146 N.W. 851, 855–856 (1914). See Otis Elevator Co. v. Maryland Cas. Co., 95 Colo. 99, 33 P.2d 974, 977 (1934); City of Lincoln v. First Nat'l Bank, supra, 67 Neb. 401, 93 N.W. 698, 699 (1903); Restatement, Judgments § 107, comments c and g (1942); 42 C.J.S. Indemnity § 32, p. 618 (1944).

This means that the cases which Barber cites to us are clearly distinguishable. Hessler v. Hillwood Mfg. Co., supra, 302 F.2d 61, is an example. There the claim of defect centered in a single tempered steel nail which had broken under a hammer blow and caused the injury and not, broadly, in an assembled and complicated piece of machinery only one part of which was supplied by the alleged indemnitor. A like comment is applicable to Liberty Mut. Ins. Co. v. J. R. Clark Co., supra, 239 Minn. 511, 59 N.W.2d 899, where the injury was the result of a collapse of a stepladder manufactured in its entirety by the defendant; yet even in this case the court recognized the existence of defenses possibly available in the indemnity action.

The situation might have been different had Barber's notice and demand upon Bruning been restricted to a defense of the coupling. In that narrow area Barber's liability was secondary to Bruning's. Then Bruning might properly have been required to defend its coupling jointly with Barber's own defense on that and other issues.

■ Having reached the conclusion that, on these facts, there was no obligation on the part of Bruning to enter the New York suit, it follows, wholly apart from any question of good faith defense there, that the transcript of the New York proceedings is not admissible against Bruning in the federal indemnity suit as conclusive evidence of a defect in the Bruning coupling. Roucher v. Traders & Gen. Ins. Co., 235 F.2d 423, 424–425 (5 Cir. 1956); 5 Wigmore, Evidence §§ 1386, 1388 (3d ed. 1940). This is so even though the New York court specifically found that the coupling was the cause of Grace's injury. Grummons v. Zollinger, 189 F.Supp. 64, 66 (N.D. Ind.1960); Flanzbaum v. M & M Transp. Co., 286 F.2d 500, 503 (2 Cir. 1961).

What has been said thus far of course does not of itself absolve Bruning of liability to Barber. Barber was still free to impose, if it could, an obligation of

indemnity on Bruning. But its attempt to do so in the Nebraska suit must go beyond mere proof of the New York results. And, in the Nebraska action, Bruning was free to defend itself, if it could, on the theory that something other than fault in the coupling caused Grace's injury.

■■ This takes us to the proof in the federal trial. Without the New York record the case against Bruning, as Barber itself conceded at oral argument, seems to fail for lack of proof. But, even if we assume that the New York transcript and accompanying exhibits were admissible in the Nebraska action, we could not conclude, on the entire record, that Judge Robinson's findings were not supported by substantial evidence or were clearly erroneous within the meaning of Rule 52(a), Fed.R.Civ.P.

We have in mind the accepted standards that, in a case tried to the court, its findings are presumptively correct, that we are to take that view of the evidence favorable to the appellee, that the findings are not to be disturbed unless clearly erroneous, and that the appellee is entitled to the benefit of all favorable inferences. Barryhill v. United States, 300 F.2d 690, 693–694 (8 Cir. 1962); Cleo Syrup Corp. v. Coca-Cola Co., 139 F.2d 416, 417–418 (8 Cir. 1943), cert. denied 321 U.S. 781; Consolidated Sun Ray, Inc. v. Oppenstein, 335 F.2d 801, 804 (8 Cir. 1964). It then suffices for us only to observe that the trial court's finding "that any failure on the part of said coupling was not due to the inherent design or manufacture", but probably "to factors such as improper use or abuse", which we equate with a finding that Barber did not provide proof of negligence in Bruning, is adequately supported by the record. It finds support in the testimony of Bruning's executive vice-president, an engineer by profession, to the effect that the Bruning coupler system is designed so that a clear flow of hydraulic fluid "is present regardless of whether there are springs in the coupling and regardless of aberations which may occur, such as cocked poppets", and that during his period with Bruning there has been no problem incident to wear, although there have been a few cases "where damage to the valve guide has been caused by abuse". It finds support in the testimony of Bruning's president, who designed the coupling, that the only internal thing he knew of which could cause the valve to stick was contamination in the hydraulic system. It finds support in the testimony of Barber's own vice-president and director of engineering to the effect that if controls placed on the asphalt mill by Barber itself were to fail when the mill was "on semi-automatic", the machine conceivably would discharge straight asphalt; that the Barber-Greene asphalt plant had a solenoid valve which controlled the hydraulic system and which, in case of failure, "would affect the operation of the plant" and "you could get an excess" although limited amount of asphalt; that he made no test on a Bruning coupling; that the particular coupling on the New York machine was never available to him; that the coupling employed in the New York litigation was a similar one which he tested only observationally; that no one knows the treatment the Bruning coupling in the New York machine received after it left the Bruning plant; that he had seen one Bruning coupling which had failed; that this was after the New York accident; that, except for that one, the Bruning couplings he had seen appeared to be in satisfactory condition; that dirt in the hydraulic fluid can cause difficulty with a solenoid valve; that he made no test on the geometric design of the coupling; that it sounded reasonable that an operator would relieve pressure on a hydraulic system by hitting the coupler's poppet with a hammer; and that this would have a tendency to damage the poppets and valve guides and was a use of the coupler "in a way it was not designed to be used", and was something he would not recommend.

This makes it unnecessary for us to pass upon Bruning's alternative argu-

ment that Barber's defense of the New York action was not conducted in good faith.

The district court's judgment is affirmed.