**MASTER BLASTER, INC.,**
**Respondent,**

v.

**Doug DAMMANN, et al., Appellants.**

**No. A09–1617.**

Court of Appeals of Minnesota.

April 13, 2010.

William M. Hart, Michael D. Hutchens, Damon L. Highly, Nicole L. Brand, Meagher & Geer, P.L.L.P., Minneapolis, MN, for respondent.

Blake W. Duerre, David M. Reddan, Paul E.D. Darsow, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, MN, for appellants.

Considered and decided by
PETERSON, Presiding Judge;
KLAPHAKE, Judge; and
STONEBURNER, Judge.

## OPINION

STONEBURNER, Judge.

In this common-law indemnity action involving the practice of vouching, appellant indemnitor challenges summary judgment granted to respondent indemnitee, binding indemnitor to the verdict in a South Dakota action from which indemnitor was dismissed for lack of personal jurisdiction. Indemnitor asserts that: (1) an inherent conflict of interest between indemnitor and indemnitee precluded indemnitor's acceptance of indemnitee's tender of defense of the South Dakota action and therefore precludes application of vouching; (2) indemnitor's interests were inadequately represented in the South Dakota action, depriving it of a full and fair opportunity to be heard; (3) binding indemnitor to the South Dakota judgment violates its due-process rights because South Dakota lacks personal jurisdiction over indemnitor; and (4) summary judgment was inappropriate on the issue of indemnitor's breach of implied warranty of fitness because indemnitor provided only services and has no implied-warranty liability.

## FACTS

In October 1999, Supreme Pork, Inc., a South Dakota corporation that owns feed and hog operations in eastern South Dakota and western Minnesota, bought two commercial-grade pressure washers from respondent Master Blaster, Inc., a South Dakota corporation owned by Paul Miersma, to be installed at Supreme Pork's hog facility near Lake Benton, Minnesota. The pressure washers were manufactured by All American Pressure Washers. Master Blaster installed the pressure washers in the southeast corner of the pressure-washer room of the hog facility.

A pressure washer generates tremendous heat and requires a flue vent to release hot gases through the attic space above the ceiling and out of the roof of the building in which it is installed. Master Blaster hired appellant Pipestone Plumbing & Heating, Inc. (Pipestone), a Minnesota corporation owned by appellant Doug Dammann, to supply and install flue vents for the pressure washers installed by Master Blaster. On site, Pipestone fabricated some venting components necessary for installation of the flues. The contract between Master Blaster and Pipestone was oral.

Approximately two years after the pressure washers were installed, one of the pressure washers froze. Master Blaster removed that pressure washer from the site, repaired it in Master Blaster's shop, and returned it to the hog facility, where it was reconnected by Supreme Pork. A few days later, a fire erupted in the pressure-washer room. The fire originated in the southeast corner of the room, in the attic space directly above the pressure washers.

Supreme Pork notified Master Blaster, Pipestone, All American Pressure Washers, and LB White, the manufacturer of a space heater that was located in the pressure-washer room at the time of the fire, that Supreme Pork had retained an expert fire investigator, Chris Rallis, to investigate the cause of the fire and to schedule site inspections. Before the site inspections, Pipestone hired fire investigator Terry Parks, All American hired fire investigator Richard Cox, and LB White

hired fire investigator Dr. Robert Schroeder.

On April 18, 2002, Dammann, Miersma, and all of the fire investigators except Cox convened at the hog facility to inspect the site. Cox inspected the site the next day. At the time of the April inspections, most of the hog facility's buildings had been removed from the site and the only room available for inspection was the pressure-washer room. Master Blaster later retained fire investigator Jeffrey Washinger, who inspected the site in August 2002.[1]

In January 2004, Supreme Pork sued Master Blaster in South Dakota for its fire loss, alleging negligence and breach of implied warranty. Both claims specifically referenced the venting system as the cause of the fire. The recitation of facts in the complaint, reflecting the opinion of Supreme Pork's fire investigator, stated that investigation of the fire revealed that Master Blaster

> failed to properly install the vents in a manner so as to maintain proper separation between heat from the flue gases and the materials that formed in the building. The use of the washers allowed the expulsion of these gases in a manner and duration that lowered the ignition temperature of the building materials to a point where they became heated to a smoldering ignition state. This condition progressed to a free-burning fire during the early morning hours of March 21, 2002.

In May 2004, Master Blaster brought a third-party claim against Pipestone in the South Dakota action, seeking indemnity. In June 2005, Pipestone was dismissed from the South Dakota action for lack of personal jurisdiction. Master Blaster immediately tendered its defense of the ac-

tion to Pipestone and Pipestone's insurer, asserting common-law indemnity against Pipestone in the event of a judgment against Master Blaster for Pipestone's acts. Pipestone refused this tender and two subsequent tenders. Pipestone also refused to allow Master Blaster to depose Pipestone's fire investigator, Terry Parks, in preparation for the South Dakota action.

At trial, Supreme Pork argued that Master Blaster was vicariously liable for Pipestone's negligence and breach of implied warranty. Supreme Pork did not assert any claims that Master Blaster was directly responsible for the fire. Supreme Pork's expert, Chris Rallis, testified that, in his opinion, there was only one source of heat capable of generating the ignition for this fire: the vent stacks for the pressure washers. Rallis blamed the fire solely on improper installation of the flue vents too close to cellulose insulation, due to Pipestone's failure to secure its "flimsy," "field-constructed" attic shields. Master Blaster extensively cross-examined Rallis in an attempt to undermine his qualifications and his opinions.

Supreme Pork also called Dr. Schroeder, who had initially been retained by LB White. Dr. Schroeder agreed with Rallis that the fire was caused by the heat in the flue igniting the cellulose insulation, which he described as "nothing more than ground-up newspapers." He opined that the Pipestone-fabricated attic shields were not approved, designed, or manufactured for the intended purpose of preventing the hot flue from coming into contact with the combustible cellulose insulation. Dr. Schroeder testified that Pipestone's shields were substantially inferior to shields made by the manufacturer of the flues that Pipe-

---

1. By the time Washinger inspected the site, the pressure-washer room had also been removed, but Washinger reviewed photographs and the physical evidence that had been retained. He discussed the fire with Rallis and reviewed Rallis's preliminary report.

stone installed. Master Blaster extensively cross-examined Dr. Schroeder about his opinion, mistakes in his initial report, and the possible causes of the fire that he had not explored.

Master Blaster called two experts: Terry Kern and Richard Cox, who both testified that based on the available evidence, the cause of the fire could not be determined. Kern disagreed with Dr. Schroeder's characterization of Pipestone's shields as "flimsy," testifying that the 28–gauge steel used should be sufficient to prevent the insulation from coming into contact with the hot pipes. Kern testified that other potential fire causes were not satisfactorily eliminated. Cox also testified that the shields were "perfectly adequate for the job," and that there was no evidence of improper installation. Both Kern and Cox testified that there was a good possibility that the fire had an electrical cause—an opinion shared by the chief of the fire department that responded to the fire.

Master Blaster did not call Washinger, who stated in his deposition that he had no basis on which to disagree with Rallis and Dr. Schroeder, because all of the hog-facility buildings, including the pressure-washer room, had been removed by the time he visited the site. But Supreme Pork read Washinger's deposition testimony into the record.

The jury was instructed that Pipestone was the agent of Master Blaster for the purpose of installing flue vents at the hog facility, that both had a duty to use reasonable care under the circumstances to install the flue vents so that Supreme Pork's property would not be damaged, and that an implied warranty of fitness for a particular purpose was breached if the flue vents were not fit for the particular purpose specified by Supreme Pork at the time of sale. The jury found that Pipestone was negligent and had breached an implied warranty of fitness for a particular purpose. The jury found that Pipestone's conduct caused 95% of Supreme Pork's damages, for which judgment was entered against Master Blaster. Master Blaster appealed to the South Dakota Supreme Court.

Master Blaster then sued Pipestone in Minnesota for indemnity, including the costs of defense. The district court granted Master Blaster's motion for summary judgment based on the common-law practice of "vouching." But the issue of damages remained open until the South Dakota Supreme Court affirmed the South Dakota district court judgment.[2] The district court then awarded Master Blaster damages that included indemnification for the South Dakota judgment, plus interest and the costs of defense and appeal in that action. This appeal by Pipestone followed, challenging the district court's holding that Pipestone is bound by the South Dakota judgment on liability.

### ISSUES

1. Did the district court err in granting summary judgment to Master Blaster on its indemnity claim against Pipestone under common-law "vouching"?

2. Did the district court err in holding Pipestone liable under a claim of breach of implied warranty of fitness for a particular purpose?

### ANALYSIS

#### I. Standard of Review.

"On appeal from summary judgment we ask two questions: (1) whether there are

2. *Supreme Pork, Inc. v. Master Blaster, Inc.,* 764 N.W.2d 474 (S.D.2009).

any genuine issues of material fact and (2) whether the [district court] erred in [its] application of the law." *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). We review both questions de novo. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 77 (Minn.2002).

We review the evidence in the light most favorable to the party against whom judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993). No genuine issue for trial exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69 (Minn.1997). Mere metaphysical doubt as to a factual issue which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions does not create an issue of material fact for trial. *Id.* at 71. "[T]he party resisting summary judgment must do more than rest on mere averments." *Id.*

## II. The common-law practice of "vouching" is recognized in Minnesota.

■ The label "vouching" comes from the ancient practice of bringing a warrantor into an action by "writ of voucher." *State Bank of New Prague v. Am. Sur. Co. of N.Y.*, 206 Minn. 137, 145, 288 N.W. 7, 11 (1939). Tender of defense has long since replaced the writ of voucher. *See id.* at 146, 288 N.W. at 11 (stating that "[p]arties responsible over are no longer vouched in as parties of record. Instead they are notified to defend, which long ago superceded the technical voucher...."). Under this practice,

> [i]f the person sued gives due notice of the pendency of the suit to the one who is responsible [by operation of law or by contract] and requests him to assume

the defense, all the cases agree that the latter will be concluded by the judgment rendered if sued upon his obligation by the former.

*Id.*(citation omitted). The term "vouching," however, is still used to describe the process.

■ "Vouching helps to avoid duplicative litigation and the risk of inconsistent results in adjudicating indemnification claims." *Universal Am. Barge Corp. v. J–Chem, Inc.*, 946 F.2d 1131, 1138 (5th Cir. 1991). "An alleged indemnitor who is vouched into a court proceeding may be subject to having the prior determination used against the vouchee in the subsequent indemnification action even if the vouchee does not appear and defend in the first action." *Id.* at 1139.

> Generally, once the alleged indemnitor is vouched in, the vouchee must choose either to appear and defend or to decline the tender, though the vouchee must make this choice without the benefit of an authoritative determination of the primary defendant's right of indemnification. If the vouchee declines, the vouchee loses certain prerogatives in any subsequent indemnification action brought by the primary defendant, and results of the primary lawsuit may be binding in the subsequent action. For example, the alleged indemnitor may not contest the validity of the primary defendant's liability to the injured party. He may contest only whether notice was sufficient, whether he has a duty to indemnify, and whether the prior judgment was obtained by fraud or collusion.

*Id.*

In *State Bank*, the supreme court stated that "[t]he practice of concluding a person responsible over by notice to defend, which has persisted as the law of the land for well nigh five centuries, if not longer, is

not lacking in due process." 206 Minn. at 146, 288 N.W. at 11.

> The indemnitor is bound in such a case not by the contract of indemnity, except where it expressly so provides, nor by the judgment as a determination of the issue against him, but by estoppel in pais [3].... The estoppel to claim a right to be heard on the original issues between [indemnitor and indemnitee] results from the refusal of [the indemnitor] to accept the tender of [the right to defend] when it was offered him and it was his duty to accept.

*Id.* at 143–44, 288 N.W. at 10–11 (citations omitted).

■ But if a party does not *properly* vouch-in another, that party cannot utilize the judgment in the underlying case as conclusive evidence against the putative vouchee. *See, e.g., United N.Y. Sandy Hook Pilots Ass'n v. Rodermond Indus., Inc.,* 394 F.2d 65, 72–73 (3d Cir.1968) (holding, in an indemnity action, that indemnitors were not bound by findings in a prior action by third party against indemnitee, where indemnitors had not been timely vouched-in to the prior action); *see also Int'l Fid. Ins. Co. v. Goltra Corp.,* 149 N.J.Super. 574, 374 A.2d 481, 483 (N.J.Sup.Ct.App.Div.1977) (stating that, where the vouching procedure is deficient, the voucher "will be required to introduce evidence anew which will demonstrate that the indebtedness was rightfully due to the [plaintiff in the underlying action]"); *see also Ill. Cent. R. Co. v. Blaha,* 3 Wis.2d 638, 89 N.W.2d 197, 201 (1958) ("The omission to give notice to the indemnitor ... does not affect the [indemnitee's] right of action against him, but simply changes the burden of proof and imposes on the indemnitee the necessity of again litigating and

establishing all of the actionable facts." (quotation omitted)).

■ The common-law process of vouching has been, for the most part, supplanted by modern third-party pleading practice under the applicable federal and state rules of civil procedure. 3 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law,* § 10.95 at 956 (West Group 2002). But vouching continues to be employed, primarily in situations, such as here, where the vouchee is not subject to personal jurisdiction in the underlying action. *See Humble Oil & Ref. Co. v. Philadelphia Ship Maintenance Co.,* 444 F.2d 727, 735 n. 15 (3d Cir.1971) (noting that because impleader is the most expeditious procedure, at least one legal scholar would restrict the use of vouching to cases in which process on the indemnitor cannot be obtained).

### III. Restatement (Second) of Judgments § 57 (1982) provides an appropriate framework for determining when an indemnitor who is vouched-in to an action will be bound by a judgment against the indemnitee.

Pipestone argues that it cannot be bound by the South Dakota judgment because, (1) due to an inherent conflict of interest with Master Blaster, Pipestone was precluded from accepting the tender of defense; (2) Master Blaster failed to adequately represent Pipestone's interests in the South Dakota action; (3) due process prevents Pipestone from being bound by a judgment from a court that lacked personal jurisdiction over Pipestone; and (4) Pipestone was procedurally disadvan-

---

**3.** "Estoppel in pais" is defined as equitable estoppel. *Black's Law Dictionary,* 631 (9th ed. 1999).

taged due to South Dakota's spoliation rules.

Though the practice of vouching has long been recognized in Minnesota, the relevant Minnesota caselaw—which is not recent—does not fully articulate the requirements for proper vouching. However, as noted by Master Blaster and the district court, several more recent federal cases have addressed the practice. We find these cases instructive, as did the district court.

Both parties and the district court cite *Universal*, 946 F.2d at 1139, involving procedural facts similar to those here, even though the underlying action in *Universal* was an arbitration proceeding rather than a district court action in another state. Universal American Barge (Universal), a ship owner, was held liable to a shipper for the value of the shipper's cargo, which was destroyed by a fire on the ship. *Id.* at 1135. Universal sought indemnification from fumigators who had treated a portion of the cargo with a chemical found to have caused the fire. *Id.* Universal was unable to secure personal jurisdiction to compel the fumigators to join the arbitration but tendered defense of the arbitration to them. *Id.* The fumigators declined the tender. *Id.*

After being found liable for the loss, Universal brought an indemnity action against the fumigators and moved for summary judgment. *Id.* at 1135–36. The district court granted the motion, concluding that the fumigators had been vouched-in to the underlying arbitration and were therefore precluded from relitigating their fault, entitling Universal to indemnification from the fumigators. *Id.* at 1136.

On appeal, the fumigators argued that even if they were vouched-in to the action, the vouching was legally insufficient to preclude them from litigating their fault, because their interests were not adequately litigated by the carrier in the underlying arbitration. *Id.* at 1138. The Fifth Circuit Court of Appeals agreed with the fumigators and reversed the summary judgment on the issue of fault, concluding that, because the shipper asserted claims of Universal's independent negligence, a conflict of interest "divided [the carrier] and the fumigators on the issues of fault." *Id.* at 1141. Due to the conflict of interests, Universal could not effectively represent both itself and the fumigators because Universal would have to argue its own negligence to adequately defend the fumigators. *Id.* And there was a conflict of interest between Universal and the fumigators regarding the cause of certain types of damages claimed. *Id.* at 1141–42.

Stating that offensive collateral estoppel under vouching is not available as a matter of law on any issue that was tainted by a conflict of interest between the putative indemnitor and indemnitee in the arbitration, the court affirmed application of issue preclusion to the issues of Universal's liability to the shipper, the amount of damages, and the cause of the fire. *Id.* at 1142–43. But the court remanded for trial the issues of the fumigators' fault and duty to indemnify, and the issue of damages apportionment. *Id.*

In reaching its decision, the Fifth Circuit Court of Appeals noted that it had been guided, in the application of issue preclusion to indemnification suits not involving contractual duty, by the Restatement (Second) of Judgments § 57 (1982), titled "Effect on Indemnitor of Judgment Against Indemnitee." *Universal*, 946 F.2d at 1139. The Restatement (Second) of Judgments § 57(1) provides, in relevant part, that, "[e]xcept as stated in Subsection (2)," when an indemnitor has been given reasonable notice of an action against the indemnitee and an opportunity to assume or participate in its defense, a judgment

against the indemnitee affects the indemnitor in a subsequent action by the indemnitee for indemnification by (1) stopping the indemnitor from disputing the existence and extent of the indemnitee's liability to the injured person, and (2) precluding the indemnitor from relitigating issues determined in the action against the indemnitee if the indemnitee defended the action with due diligence and reasonable prudence.

Subdivision (2) provides:

If there is a conflict of interest between the indemnitee and the indemnitor regarding the injured person's claim against the indemnitee, so that the indemnitor could not properly have assumed the defense of the indemnitee, a judgment for the injured person precludes the indemnitor only with respect to issues determined in that action as to which:

(a) there was no conflict of interest between the indemnitee and the indemnitor; and

(b) the indemnitee conducted a defense with due diligence and reasonable prudence.

Restatement (Second) of Judgments § 57(2). "A 'conflict of interest' for purposes of this Section exists when the injured person's claim against the indemnitee is such that it could be sustained on different grounds, one of which is within the scope of the indemnitor's obligation to indemnify and another of which is not." Restatement (Second) of Judgments § 57(3). We conclude that the principles set out in the Restatement (Second) of Judgments § 57 should guide this court in the application of indemnification actions involving vouching.

**IV. There was no conflict of interest in this case between Master Blaster and Pipestone regarding the cause of the fire.**

Supreme Pork sued Master Blaster in South Dakota on a theory of vicarious liability for the acts of Pipestone. Supreme Pork's claim could not have been sustained on a different ground—one that would be outside the scope of Pipestone's obligation to indemnify Master Blaster—because Supreme Pork never asserted any independent claim of negligence or breach of contract or warranty against Master Blaster. Pipestone was a party to the lawsuit for approximately one year, and Master Blaster knew that Supreme Pork's claims against Master Blaster were based solely on vicarious liability for Pipestone's acts. And Master Blaster's three tender-of-defense letters expressly reminded Pipestone that the claims against Master Blaster were based on vicarious liability for the acts of Pipestone.

Pipestone relies on three cases in support of its argument that there was a conflict of interest between it and Master Blaster, rendering the vouching ineffective to bind Pipestone by the South Dakota jury's determination of fault. Pipestone first correctly cites *Barber–Greene Co. v. Bruning Co.*, 357 F.2d 31, 35–36 (8th Cir. 1966), for the proposition that vouching and tenders of defense cannot bind the putative indemnitor to a judgment against the indemnitee where the indemnitee does not defend the primary action in a manner consistent with and in a way that protects the putative indemnitor's interests. But we disagree that *Barber–Greene* leads to a conclusion that Master Blaster did not appropriately defend Pipestone's interests.

The underlying action in *Barber–Greene* involved the personal injury claims of a truck driver who was injured when he was sprayed with hot asphalt from a mixing plant built by Barber–Greene. *Id.* at 32. Even before Barber–Greene was sued, Barber–Greene, based on its conclusion that the accident was attributable to a

malfunction of a quick-disconnecting coupler installed in the plant's hydraulic system, tendered its defense to Bruning, the manufacturer of the coupling. *Id.* Second and third tender notices followed after Barber–Greene's attorneys received the complaint, which alleged that Barber–Greene "negligently and carelessly designed, manufactured, constructed, inspected and installed" the asphalt-mixing machine. *Id.* at 32–33. Bruning did not accept the tenders of defense, and the injured truck driver obtained a judgment against Barber–Greene for substantial damages, based on a finding that the asphalt-mixing machine was manufactured by Barber–Greene and incorporated a defective coupling manufactured by Bruning. *Id.* at 33.

Barber–Greene sued Bruning for indemnity. *Id.* The district court in the indemnity action declined to bind Bruning to the judgment against Barber–Greene because, in the underlying action, more than one theory existed for holding Barber–Greene liable, and the exploitation of the other theories would have been in Bruning's best interests such that accepting full defense of Barber–Greene would have compromised Bruning's interests. *Id.* at 33–35. Additionally, the district court noted that there was persuasive testimony presented in the indemnity action that any failure of the coupling was not due to design, but to factors such as improper use or abuse, and that the defense in the underlying suit was not handled in good faith insofar as Bruning was concerned. *Id.* at 34.

The Eighth Circuit, holding that the transcript of the underlying action was not admissible against Bruning in the indemnity suit as conclusive evidence of a defect in the coupling, observed that "[i]t was a situation where, even though Bruning were to appear in the [underlying] action and successfully defend its coupling, a judg-ment in Barber's favor would not necessarily be the result. Bruning thus could not consistently defend both Barber's interests and its own." *Id.* at 35. Therefore, Bruning was "free to defend itself in the indemnity action against any claim of negligence on its part." *Id.* But the court also noted that "[t]he situation might have been different had Barber's notice and demand upon Bruning been restricted to a defense of the coupling. In that narrow area Barber's liability was secondary to Bruning's." *Id.*

In this case, Pipestone, through Dammann, admitted that only Pipestone was responsible for the vent system in the hog facility. And Supreme Pork's theory of recovery was that Pipestone's negligence and/or breach of implied warranty of fitness for a particular purpose caused the fire and Supreme Pork's damages. The only defense tendered to Pipestone was to defend claims about Pipestone's work— exactly the situation that the Eighth Circuit indicated would have bound Bruning to the judgment in *Barber–Greene.* The holding in *Barber–Greene* is consistent with the district court's holding in this case that Pipestone is bound by the South Dakota verdict.

Pipestone also cites *Universal* for its reliance on *Barber–Greene* for the proposition that, in considering preclusion by vouching, the court is required to

consider together (1) the scope of the putative indemnitor's duty, under whatever theory is properly available to the indemnitee, and (2) the existence in the first proceeding of any liability claims against the indemnitee which fall outside the scope of indemnification, thus raising issues tainted by conflict of interest requiring relitigation.

*Universal,* 946 F.2d at 1140. But this invocation of *Barber–Greene* also supports the district court's decision here. None of

the claims asserted by Supreme Pork against Master Blaster were outside the scope of Pipestone's indemnification duty, which was to indemnify Master Blaster for liability attributable to the vent system. The judgment against Master Blaster, therefore, falls entirely within the scope of Pipestone's duty to indemnify Master Blaster. The district court correctly concluded that this case does not raise conflict-of-interest issues like those present in *Barber–Greene* and *Universal.*

Pipestone also relies on *Dixon v. Fiat–Roosevelt Motors, Inc.,* 8 Wash.App. 689, 509 P.2d 86 (1973). In that case, Dixon sustained injuries while driving a car manufactured by Fiat and sold by Aurora Imports, Inc. *Dixon v. Fiat–Roosevelt Motors, Inc.,* 4 Wash.App. 731, 483 P.2d 855, 855 (1971). Dixon sued both Aurora and Fiat for injuries allegedly caused by the car's defective magnesium alloy ("mag") wheel. *Id.* at 855–56. Both Aurora and Fiat tendered the defense of the action to American Racing Equipment (ARE), which had manufactured the wheel. *Id.* at 856. ARE rejected both tenders. *Id.* In their defense of Dixon's action, neither Aurora nor Fiat addressed the issue of whether the wheel was defective when it left ARE's control. *Id.* The action resulted in a judgment for Dixon. *Id.*

Fiat subsequently sued ARE for indemnification and was granted summary judgment, which ARE appealed. *Id.* The Washington Court of Appeals ultimately reversed and remanded, concluding that ARE was not bound by the verdict, noting that the tender of defense did not demonstrate that ARE would eventually be found liable for Dixon's injuries. *Dixon,* 509 P.2d at 90–91. ARE's liability turned on whether the defect existed at the time the wheel left ARE, occurred in transit, or occurred while the wheel was in Fiat's possession; and that issue (i.e., when the defect first occurred) would not be litigated in the underlying action, which was based on strict liability. *Id.*

But, *Dixon,* like the other cases relied on by Pipestone, is distinguishable from the instant case and also supports the district court's decision that Pipestone was properly vouched-in to the South Dakota action. In *Dixon,* Fiat could have avoided liability to Dixon by shifting blame to ARE. But Master Blaster could not have avoided liability by shifting the blame to Pipestone, because Supreme Pork's entire case was based solely upon Pipestone's conduct.

Pipestone also cites *Schumann v. McGinn,* 307 Minn. 446, 240 N.W.2d 525 (1976), and *Pirrotta v. Indep. Sch. Dist. No. 347,* 396 N.W.2d 20 (Minn.1986), in support of its arguments. We do not find either case instructive.

*Schumann* involved a question about the legal basis for a *plaintiff* to hold two defendants (principal and agent) liable for his loss, one of whom (principal) was not a party. 307 Minn. at 447–49, 240 N.W.2d at 527–28. But this case is not about Pipestone's liability to Supreme Pork: it is about Pipestone's duty to indemnify Master Blaster. And, to the extent that *Schumann* addresses the issue of privity or conflicting interests, it is distinguishable from the instant case. In *Schumann,* the district court concluded that the principal and its agent were not in privity because their interests were adverse. *Id.* at 471, 240 N.W.2d at 539. On the facts in *Schumann,* "[i]n order to protect its own interest, the [principal, who was alleged to have improperly trained its agent] would have found it necessary to characterize [the agent]'s conduct as an unlawful and unprivileged battery committed by him while outside the scope of his duties as a police officer." *Id.* at 470, 240 N.W.2d at 538–39. But here, just the opposite is true: in order to protect its own interest, Master

Blaster needed to prove that Pipestone's acts did not cause the fire. Master Blaster's and Pipestone's interests were fully aligned in the South Dakota litigation.

In *Pirrotta,* the Minnesota Supreme Court held that collateral estoppel did not apply to prevent a non-party from relitigating issues affecting his interests, namely a determination of his seniority rights vis-à-vis another teacher, because the employer school district had pursued only its own interests in the prior determination of the other teacher's seniority rights. 396 N.W.2d at 21. In *Pirrotta,* the school district "act[ed] [o]n its own behalf and without any accountability to Pirrotta." *Id.* at 22. But here, again, just the opposite is true: (1) Master Blaster was forced to defend the acts of Pipestone on its own because Pipestone refused to accept the defense of the South Dakota action, which was based purely on Pipestone's conduct; and (2) Master Blaster's three tenders of defense, attempt to subpoena Pipestone's expert, and presentation of evidence at trial aimed at exonerating Pipestone, all demonstrate that Master Blaster was accountable for Pipestone's interests.

In response to Master Blaster's summary judgment motion, Pipestone did not offer or allege the existence of any evidence from which a jury could have determined that Master Blaster's own negligence or breach of an implied warranty of fitness caused the fire. We conclude that the undisputed facts of this case demonstrate no inherent conflict between Pipestone and Master Blaster that would permit Pipestone to relitigate the facts already litigated in South Dakota.

## V. Master Blaster acted with due diligence and reasonable prudence in defense of Supreme Pork's claims against Pipestone.

■ Pipestone asserts that Master Blaster failed to address the other possible causes of the fire that Pipestone would have asserted in the South Dakota action and that Master Blaster's experts failed to perform any forensic tests in an effort to disprove Supreme Pork's theories of liability. *See Universal,* 946 F.2d at 1140 ("Adequate representation makes sure that the issues of shared concern to the indemnitee and indemnitor alike are actually and fully litigated."); *see also* Restatement (Second) of Judgments § 57(1)(b) (stating that "[t]he indemnitor is precluded from relitigating issues determined in the action against the indemnitee if . . . *the indemnitee defended the action with due diligence and reasonable prudence*" (emphasis added)).

But Pipestone has failed to demonstrate that any actual evidence exists or could be discovered regarding other possible causes of the fire. Pipestone thwarted Master Blaster's attempt to discover the opinion of Pipestone's expert fire investigator on the origin of the fire. And, in response to Master Blaster's summary judgment motion, Pipestone has not produced any evidence beyond that presented by Master Blaster in the South Dakota action: that Supreme Pork failed to adequately investigate some other possible causes of the fire and that two experts concluded that the cause of the fire remained undetermined. The trial transcript reflects that Master Blaster's counsel vigorously cross-examined Supreme Pork's experts, who opined that the sole cause of the fire was faulty installation of the flue vent.

Pipestone had the opportunity to participate in the South Dakota litigation as a party or by accepting Master Blaster's tender of defense and, in this indemnity action, has failed to demonstrate that Master Blaster neglected to present existing evidence that would have been favorable to

Pipestone. We conclude that poking hypothetical holes in Master Blaster's defense, based on mere speculation, is not sufficient to demonstrate that Master Blaster failed to defend with due diligence and reasonable prudence. *See Bob Useldinger & Sons, Inc. v. Hangsleben,* 505 N.W.2d 323, 328 (Minn.1993) (stating that "[m]ere speculation, without some concrete evidence, is not enough to avoid summary judgment").

## VI. Pipestone has failed to establish that procedural differences between Minnesota and South Dakota preclude application of vouching.

■ Pipestone argues that it cannot be bound to the South Dakota judgment by having been vouched-in to the South Dakota action because it would thereby be deprived of procedural opportunities available in Minnesota that are not available in South Dakota. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330–31, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979) (stating that it might be unfair to apply offensive estoppel "where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result"); *see also Universal,* 946 F.2d at 1138 (stating that the district court must determine whether procedural opportunities available to the party in the subsequent action "might be likely to cause a different result") (quoting *Parklane,* 439 U.S. at 332, 99 S.Ct. at 652).

■ The district court, noting that it was required to determine whether procedural opportunities available to Pipestone in Minnesota might be likely to cause a different result, adopted the reasoning stated in *Universal,* which we now adopt, that when a party rejects the opportunity to appear and defend after notice, it cannot escape the use of the prior judgment as conclusive evidence of its liability and the amount of damages unless it makes "a *particularized showing* of harm to establish the *prejudicial effect* of procedural differences." 946 F.2d at 1138 (emphasis added).

The district court concluded that Pipestone failed to make such a showing in this case. Pipestone's procedural argument is that in Minnesota, a district court has discretion to sanction spoliation of evidence by excluding expert testimony, whereas in South Dakota, according to Pipestone, a district court judge can only make an adverse inference as a result of spoliation—and then only if spoliation is intentional and in bad faith. *See State v. Engesser,* 661 N.W.2d 739, 754–55 (S.D.2003) (holding that the trial court properly refused to give defendant's proposed jury instruction on spoliation of evidence because the record did not show that the destruction of evidence was intentional or made in bad faith).

But the district court found that Pipestone did not present any evidence that removal of all but the pressure-washer room, where the fire originated, constituted spoliation under Minnesota law that would have warranted the exclusion of Supreme Pork's expert testimony. Pipestone does not challenge that finding on appeal. Rather, Pipestone merely asserts, as it did before the district court, that before its "expert, [Parks,] was allowed to conduct his cause and origin investigation, Supreme Pork significantly altered the scene from its post-fire condition by removing and/or destroying relevant evidence," and that in Minnesota, "the district court judge likely would have excluded Supreme Pork's expert's opinion, resulting in a dismissal of the entire case for spoliation, [regardless of] the plaintiff's specific intent or bad faith." *See Patton v. Newmar Corp.,* 538 N.W.2d 116, 119 (Minn.1995) (affirming the district court's exercise of

discretion to exclude plaintiff's expert's report, where an allegedly defective motor home was destroyed after plaintiff's expert's investigation and plaintiff's expert lost components that he had retained from the inspection).

Here, unlike the situation in *Patton,* Supreme Pork's expert witness did not examine evidence that was destroyed before Pipestone's expert witness could examine it. All but one of the retained fire investigators examined the same evidence at virtually the same time and there is no evidence that any portion of the facility that was removed before the expert inspection was *relevant* to a determination of the cause of the fire. The district court correctly concluded that Pipestone had not made a colorable claim of prejudice based on procedural differences between the treatment of spoliation in Minnesota and South Dakota.

## VII. Summary judgment against Pipestone does not violate its constitutional right to due process in this case.

### A. Vouching is based on indemnity, not privity.

 Pipestone first argues that binding it to the South Dakota judgment would violate its constitutional right to due process because it was not in privity with Master Blaster. But Pipestone has not cited any relevant authority supporting the proposition that vouching requires privity to pass constitutional muster. Because Pipestone had both notice and the opportunity to be heard in the South Dakota action, we find no merit in the argument that binding it to the South Dakota judgment would violate due process. Vouching, "which has persisted as the law of the land for [more than] five centuries ..., is not lacking in due process. It affords the notice and opportunity for hearing, which

are requisite." *State Bank,* 206 Minn. at 146, 288 N.W. at 11. And vouching also satisfies the due-process requirements more recently articulated in *Parklane Hosiery,* 439 U.S. at 332, 99 S.Ct. at 652, where: (1) there is not a conflict of interest between the indemnitee and the indemnitor; (2) the indemnitee conducted a defense with due diligence and reasonable prudence; and (3) there are not different procedural opportunities available in a subsequent action that are likely to cause prejudice to the indemnitor. *Universal,* 946 F.2d at 1138, 1140. We conclude that the safeguards for the application of vouching sufficiently protect Pipestone's due-process rights.

### B. Personal jurisdiction.

 Pipestone argues that because it was dismissed from the South Dakota action for lack of personal jurisdiction, due process requires that it now have the opportunity to relitigate fault in Minnesota. For the same reasons that Pipestone's privity argument is meritless, we also find its personal-jurisdiction argument without merit. Vouching is an ancient common-law procedure which is currently used primarily in cases in which lack of personal jurisdiction or other circumstances make impleader unavailable. *See SCAC Transp. (USA), Inc. v. S.S. "DANAOS",* 845 F.2d 1157, 1162–63 (2d Cir.1988) (stating that "[c]ommon-law vouching is a superfluous procedure where impleader is available" and that a party can "be vouched into a judicial proceeding when there is neither personal jurisdiction nor consent").

Additionally, though Pipestone was dismissed as a party to the South Dakota litigation—on its own motion—it was provided with multiple "meaningful opportunities" to defend the action on behalf of Master Blaster (i.e., tenders of defense), or to assist with Master Blaster's defense

(i.e., by allowing Master Blaster to depose its expert). It chose to decline each opportunity.

### VIII. The South Dakota jury's implied-warranty verdict supports Master Blaster's right to indemnification from Pipestone.

 Pipestone also argues that because it provided only services and was not a seller of goods, it cannot be liable for breaching an implied warranty of fitness. This case was tried under Minnesota's substantive law, and Pipestone is correct that in Minnesota, implied warranties of fitness arise within the context of sales of goods, not services. *See* Minn.Stat. § 336.2–102 (2008) (applying Minnesota's Uniform Commercial Code Sales, including implied warranties of fitness for a particular purpose, to "transactions in goods").

But Pipestone's premise that it did not sell any goods is not supported by the record. The undisputed record demonstrates that Pipestone fabricated attic shields on site for the ventilation system. Supreme Pork's expert testified that the shields, which were made using sheet metal and tin cutters, were not approved, designed, or manufactured consistent with their intended purpose of preventing hot flues from coming into contact with combustible cellulose insulation. The attic shields are "goods" for the purposes of an implied warranty of fitness for a particular purpose. *See* Minn.Stat. § 336.2–105(1) (2008) (defining "goods," for purposes of the Uniform Commercial Code, as including "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid"). And as the seller of these goods, Pipestone could be held liable under an implied-warranty-of-fitness theory. *See* Minn.Stat. § 336.2–315 (2008)

(providing for an implied warranty of fitness for a particular purpose, by operation of law, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods").

### DECISION

Master Blaster properly vouched Pipestone into to the underlying action by tendering defense of the claims asserted against Master Blaster in South Dakota for its vicarious liability for the acts of Pipestone. The claims asserted against Master Blaster in the South Dakota action were all within the scope of Pipestone's duty to indemnify Master Blaster. There was no conflict of interest between Master Blaster and Pipestone with regard to the claims asserted in the South Dakota action, Master Blaster defended Pipestone's interests in the South Dakota action with due diligence and reasonable prudence, and Pipestone was not prejudiced by procedural differences between South Dakota and Minnesota. Therefore, Pipestone is bound by the jury's findings in the South Dakota case, and the district court did not err in granting summary judgment to Master Blaster on its indemnity claim against Pipestone. Furthermore, applying the doctrine of vouching to bind Pipestone to the South Dakota judgment does not violate Pipestone's constitutional right to due process because Pipestone had notice and a full opportunity to participate in the South Dakota action through Master Blaster's tender of defense.

**Affirmed.**